# PRUNEYARD SHOPPING CENTER et al. *v.* ROBINS et al.

No. 79–289.   Argued March 18, 1980—Decided June 9, 1980

Rehnquist, J., delivered the opinion of the Court, in which Burger, C. J., and Brennan, Stewart, Marshall, and Stevens, JJ., joined; in Parts I, II, III, and IV of which White and Powell, JJ., joined; and

in all but one sentence of which BLACKMUN, J., joined. MARSHALL, J., filed a concurring opinion, *post*, p. 89. WHITE, J., filed an opinion concurring in part and in the judgment, *post*, p. 95. POWELL, J., filed an opinion concurring in part and in the judgment, in which WHITE, J., joined, *post*, p. 96. BLACKMUN, J., filed a statement ·concurring in part, *post*, p. 88.

*Max L. Gillam* argued the cause for appellants. With him on the briefs were *James W. Daniels, William C. Kelly, Jr.,* and *Thomas P. O'Donnell.*

*Philip L. Hammer* argued the cause and filed a brief for appellees.

*Elinor Hadley Stillman* argued the cause for the United States as *amicus curiae* urging affirmance. With her on the brief were *Solicitor General McCree* and *Deputy Solicitor General Wallace.**

MR. JUSTICE REHNQUIST delivered the opinion of the Court.

We postponed jurisdiction of this appeal from the Supreme Court of California to decide the important federal constitutional questions it presented. Those are whether state constitutional provisions, which permit individuals to exercise free speech and petition rights on the property of a privately owned shopping center to which the public is invited, violate the shopping center owner's property rights under the Fifth

---

*Briefs of *amici curiae* urging reversal were filed by *Laurence M. Cohen* and *Charles H. May II* for Homart Development Co.; by *Dean L. Overman* and *Peter N. Kyros, Jr.,* for the International Council of Shopping Centers; and by *Joseph H. Moless, Jr.,* and *Philip B. Kurland* for Taubman Co., Inc., et al.

Briefs of *amici curiae* urging affirmance were filed by *Susan L. Paulus, Amitai Schwartz,* and *Burt Neuborne* for the American Civil Liberties Union of Northern California et al.; by *J. Albert Woll, Laurence Gold,* and *George Kaufmann* for the American Federation of Labor and Congress of Industrial Organizations; by *Nathan Z. Dershowitz* for the American Jewish Congress et al.; and by *Roger Jon Diamond* for People's Lobby, Inc.

and Fourteenth Amendments or his free speech rights under the First and Fourteenth Amendments.

## I

Appellant PruneYard is a privately owned shopping center in the city of Campbell, Cal. It covers approximately 21 acres—5 devoted to parking and 16 occupied by walkways, plazas, sidewalks, and buildings that contain more than 65 specialty shops, 10 restaurants, and a movie theater. The PruneYard is open to the public for the purpose of encouraging the patronizing of its commercial establishments. It has a policy not to permit any visitor or tenant to engage in any publicly expressive activity, including the circulation of petitions, that is not directly related to its commercial purposes. This policy has been strictly enforced in a nondiscriminatory fashion. The PruneYard is owned by appellant Fred Sahadi.

Appellees are high school students who sought to solicit support for their opposition to a United Nations resolution against "Zionism." On a Saturday afternoon they set up a card table in a corner of PruneYard's central courtyard. They distributed pamphlets and asked passersby to sign petitions, which were to be sent to the President and Members of Congress. Their activity was peaceful and orderly and so far as the record indicates was not objected to by PruneYard's patrons.

Soon after appellees had begun soliciting signatures, a security guard informed them that they would have to leave because their activity violated PruneYard regulations. The guard suggested that they move to the public sidewalk at the PruneYard's perimeter. Appellees immediately left the premises and later filed this lawsuit in the California Superior Court of Santa Clara County. They sought to enjoin appellants from denying them access to the PruneYard for the purpose of circulating their petitions.

The Superior Court held that appellees were not entitled under either the Federal or California Constitution to exercise

their asserted rights on the shopping center property. App. to Juris. Statement A–2. It concluded that there were "adequate, effective channels of communication for [appellees] other than soliciting on the private property of the [Prune-Yard]." *Id.*, at A–3. The California Court of Appeal affirmed.

The California Supreme Court reversed, holding that the California Constitution protects "speech and petitioning, reasonably exercised, in shopping centers even when the centers are privately owned." 23 Cal. 3d 899, 910, 592 P. 2d 341, 347 (1979). It concluded that appellees were entitled to conduct their activity on PruneYard property. In rejecting appellants' contention that such a result infringed property rights protected by the Federal Constitution, the California Supreme Court observed:

> " 'It bears repeated emphasis that we do not have under consideration the property or privacy rights of an individual homeowner or the proprietor of a modest retail establishment. As a result of advertising and the lure of a congenial environment, 25,000 persons are induced to congregate daily to take advantage of the numerous amenities offered by the [shopping center there]. A handful of additional orderly persons soliciting signatures and distributing handbills in connection therewith, under reasonable regulations adopted by defendant to assure that these activities do not interfere with normal business operations (see *Diamond* [v. *Bland,* 3 Cal. 3d 653, 665, 477 P. 2d 733, 741 (1970)]) would not markedly dilute defendant's property rights.' ([*Diamond* v. *Bland,* 11 Cal. 3d 331, 345, 521 P. 2d 460, 470 (1974)] (dis. opn. of Mosk, J.).)" *Id.*, at 910–911, 592 P. 2d, at 347–348.

The California Supreme Court thus expressly overruled its earlier decision in *Diamond* v. *Bland,* 11 Cal. 3d 331, 521 P. 2d 460 (*Diamond II*), cert. denied, 419 U. S. 885 (1974), which had reached an opposite conclusion. 23 Cal. 3d, at

910, 592 P. 2d, at 347.[1]   Before this Court, appellants contend that their constitutionally established rights under the Fourteenth Amendment to exclude appellees from adverse use of appellants' private property cannot be denied by invocation of a state constitutional provision or by judicial reconstruction of a State's laws of private property.   We postponed consideration of the question of jurisdiction until the hearing of the case on the merits.   444 U. S. 949.   We now affirm.

## II

We initially conclude that this case is properly before us as an appeal under 28 U. S. C. § 1257 (2).   It has long been established that a state constitutional provision is a "statute" within the meaning of § 1257 (2).   See, *e. g., Torcaso* v. *Watkins,* 367 U. S. 488, 489 (1961); *Adamson* v. *California,* 332 U. S. 46, 48, n. 2 (1947); *Railway Express Agency, Inc.* v. *Virginia,* 282 U. S. 440 (1931).   Here the California Supreme Court decided that Art. 1, §§ 2 and 3, of the California Constitution gave appellees the right to solicit signatures on appellants' property in exercising their state rights of free expression and petition.[2]   In so doing, the California Supreme Court

---

[1] The California Supreme Court in *Diamond II* had reasoned:

"In this case, as in *Lloyd* [*Corp.* v. *Tanner,* 407 U. S. 551 (1972)], plaintiffs have alternative, effective channels of communication, for the customers and employees of the center may be solicited on any public sidewalks, parks and streets adjacent to the Center and in the communities in which such persons reside.   Unlike the situation in *Marsh* [v. *Alabama,* 326 U. S. 501 (1946)] and [*Food Employees* v. *Logan Valley Plaza,* 391 U. S. 308 (1968)], no reason appears why such alternative means of communication would be ineffective, and plaintiffs concede that, unlike *Logan,* their initiative petition bears no particular relation to the shopping center, its individual stores or patrons." 11 Cal. 3d, at 335, 521 P. 2d, at 463.

*Diamond II* thus held that the shopping center owner's property rights outweighed the rights of free expression and petition asserted by the plaintiffs. *Ibid.*

[2] Article 1, § 2, of the California Constitution provides:

"Every person may freely speak, write and publish his or her sentiments

rejected appellants' claim that recognition of such a right violated appellants' "right to exclude others," which is a fundamental component of their federally protected property rights. Appeal is thus the proper method of review.

## III

Appellants first contend that *Lloyd Corp.* v. *Tanner,* 407 U. S. 551 (1972), prevents the State from requiring a private shopping center owner to provide access to persons exercising their state constitutional rights of free speech and petition when adequate alternative avenues of communication are available. *Lloyd* dealt with the question whether under the Federal Constitution a privately owned shopping center may prohibit the distribution of handbills on its property when the handbilling is unrelated to the shopping center's operations. *Id.,* at 552. The shopping center had adopted a strict policy against the distribution of handbills within the building complex and its malls, and it made no exceptions to this rule. *Id.,* at 555.[3] Respondents in *Lloyd* argued that because the shopping center was open to the public, the First Amendment prevents the private owner from enforcing the handbilling restriction on shopping center premises. *Id.,* at 564.[4]

---

on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press."

Article 1, § 3, of the California Constitution provides:

"[P]eople have the right to . . . petition government for redress of grievances."

[3] The center had banned handbilling because it "was considered likely to annoy customers, to create litter, potentially to create disorders, and generally to be incompatible with the purpose of the Center and the atmosphere sought to be preserved." 407 U. S., at 555–556.

[4] Respondents relied on *Marsh* v. *Alabama,* 326 U. S. 501 (1946), and *Food Employees* v. *Logan Valley Plaza,* 391 U. S. 308 (1968), in support of their claim that the shopping center's permission to the public to enter its property for the purpose of shopping caused its property to lose its private character, thereby permitting members of the public to exercise

In rejecting this claim we substantially repudiated the rationale of *Food Employees* v. *Logan Valley Plaza,* 391 U. S. 308 (1968), which was later overruled in *Hudgens* v. *NLRB,* 424 U. S. 507 (1976). We stated that property does not "lose its private character merely because the public is generally invited to use it for designated purposes," and that "[t]he essentially private character of a store and its privately owned abutting property does not change by virtue of being large or clustered with other stores in a modern shopping center." 407 U. S., at 569.

Our reasoning in *Lloyd,* however, does not *ex proprio vigore* limit the authority of the State to exercise its police power or its sovereign right to adopt in its own Constitution individual liberties more expansive than those conferred by the Federal Constitution. *Cooper* v. *California,* 386 U. S. 58, 62 (1967). See also 407 U. S., at 569–570. In *Lloyd, supra,* there was no state constitutional or statutory provision that had been construed to create rights to the use of private property by strangers, comparable to those found to exist by the California Supreme Court here. It is, of course, well established that a State in the exercise of its police power may adopt reasonable restrictions on private property so long as the restrictions do not amount to a taking without just compensation or contravene any other federal constitutional provision. See, *e. g., Euclid* v. *Ambler Realty Co.,* 272 U. S. 365 (1926); *Young* v. *American Mini Theatres, Inc.,* 427 U. S. 50 (1976). *Lloyd* held that when a shopping center owner opens his private property to the public for the purpose of shopping, the First Amendment to the United States Constitution does not thereby create individual rights in expression beyond those already existing under applicable law. See also *Hudgens* v. *NLRB, supra,* at 517–521.

the same free speech rights as they would have on similar public facilities or the streets of a city or town. Both of those cases, however, involved no state law authorizing the conduct of the solicitors or handbillers.

## IV

Appellants next contend that a right to exclude others underlies the Fifth Amendment guarantee against the taking of property without just compensation and the Fourteenth Amendment guarantee against the deprivation of property without due process of law.[5]

It is true that one of the essential sticks in the bundle of property rights is the right to exclude others. *Kaiser Aetna* v. *United States*, 444 U. S. 164, 179–180 (1979). And here there has literally been a "taking" of that right to the extent that the California Supreme Court has interpreted the State Constitution to entitle its citizens to exercise free expression and petition rights on shopping center property.[6] But it is well established that "not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense." *Armstrong* v. *United States*, 364 U. S. 40, 48 (1960). Rather, the determination whether a state law unlawfully infringes a landowner's property in

---

[5] Appellants do not maintain that this is a condemnation case. Reply Brief for Appellants 2. Rather, they argue that "[t]he rights of a property owner . . . are rooted in the Fifth Amendment guarantee against the taking of property without just compensation and are incorporated in the Fourteenth Amendment guarantee against the deprivation of property without due process of law." Brief for Appellants 10. Here, of course, if the law required the conclusion that there was a "taking," there was concededly no compensation, just or otherwise, paid to appellants. This argument falls within appellants' contention that *Lloyd* is controlling, see 407 U. S., at 567, and was adequately presented below. See *New York ex rel. Bryant* v. *Zimmerman*, 278 U. S. 63, 67 (1928).

[6] The term "property" as used in the Taking Clause includes the entire "group of rights inhering in the citizen's [ownership]." *United States* v. *General Motors Corp.*, 323 U. S. 373 (1945). It is not used in the "vulgar and untechnical sense of the physical thing with respect to which the citizen exercises rights recognized by law. [Instead, it] denote[s] the group of rights inhering in the citizen's relation to the physical thing, as the right to possess, use and dispose of it. . . . The constitutional provision is addressed to every sort of interest the citizen may possess." *Id.*, at 377–378.

violation of the Taking Clause requires an examination of whether the restriction on private property "forc[es] some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." *Id.*, at 49.[7] This examination entails inquiry into such factors as the character of the governmental action, its economic impact, and its interference with reasonable investment-backed expectations. *Kaiser Aetna* v. *United States, supra,* at 175. When "regulation goes too far it will be recognized as a taking." *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 415 (1922).

Here the requirement that appellants permit appellees to exercise state-protected rights of free expression and petition on shopping center property clearly does not amount to an unconstitutional infringement of appellants' property rights under the Taking Clause. There is nothing to suggest that preventing appellants from prohibiting this sort of activity will unreasonably impair the value or use of their property as a shopping center. The PruneYard is a large commercial complex that covers several city blocks, contains numerous separate business establishments, and is open to the public at large. The decision of the California Supreme Court makes it clear that the PruneYard may restrict expressive activity by adopting time, place, and manner regulations that will minimize any interference with its commercial functions. Appellees were orderly, and they limited their activity to the

---

[7] Thus, as this Court stated in *Monongahela Navigation Co.* v. *United States,* 148 U. S. 312, 325 (1893), a case which has since been characterized as resting primarily on "estoppel," see, *e. g., United States* v. *Rands,* 389 U. S. 121, 126 (1967), the Fifth Amendment "prevents the public from loading upon one individual more than his just share of the burdens of government, and says that when he surrenders to the public something more and different from that which is exacted from other members of the public, a full and just equivalent shall be returned to him." See also *Penn Central Transportation Co.* v. *New York City,* 438 U. S. 104, 123–125 (1978); *Pennsylvania Coal Co.* v. *Mahon,* 260 U. S. 393, 416 (1922).

common areas of the shopping center. In these circumstances, the fact that they may have "physically invaded" appellants' property cannot be viewed as determinative.

This case is quite different from *Kaiser Aetna* v. *United States, supra.* *Kaiser Aetna* was a case in which the owners of a private pond had invested substantial amounts of money in dredging the pond, developing it into an exclusive marina, and building a surrounding marina community. The marina was open only to fee-paying members, and the fees were paid in part to "maintain the privacy and security of the pond." *Id.,* at 168. The Federal Government sought to compel free public use of the private marina on the ground that the marina became subject to the federal navigational servitude because the owners had dredged a channel connecting it to "navigable water."

The Government's attempt to create a public right of access to the improved pond interfered with Kaiser Aetna's "reasonable investment backed expectations." We held that it went "so far beyond ordinary regulation or improvement for navigation as to amount to a taking. . . ." *Id.,* at 178. Nor as a general proposition is the United States, as opposed to the several States, possessed of residual authority that enables it to define "property" in the first instance. A State is, of course, bound by the Just Compensation Clause of the Fifth Amendment, *Chicago, B. & Q. R. Co.* v. *Chicago,* 166 U. S. 226, 233, 236–237 (1897), but here appellants have failed to demonstrate that the "right to exclude others" is so essential to the use or economic value of their property that the state-authorized limitation of it amounted to a "taking."

There is also little merit to appellants' argument that they have been denied their property without due process of law. In *Nebbia* v. *New York,* 291 U. S. 502 (1934), this Court stated:

"[N]either property rights nor contract rights are absolute. . . . Equally fundamental with the private right

is that of the public to regulate it in the common interest. . . .

.     .    .    .    .

". . . [T]he guaranty of due process, as has often been held, demands only that the law shall not be unreasonable, arbitrary or capricious, and that the means selected shall have a real and substantial relation to the objective sought to be attained." *Id.*, at 523, 525.

See also *Railway Express Agency, Inc.* v. *New York,* 336 U. S. 106 (1949); *Exxon Corp.* v. *Governor of Maryland,* 437 U. S. 117, 124–125 (1978). Appellants have failed to provide sufficient justification for concluding that this test is not satisfied by the State's asserted interest in promoting more expansive rights of free speech and petition than conferred by the Federal Constitution.[8]

## V

Appellants finally contend that a private property owner has a First Amendment right not to be forced by the State to use his property as a forum for the speech of others.[9] They

---

[8] Although appellants contend there are adequate alternative avenues of communication available for appellees, it does not violate the United States Constitution for the State Supreme Court to conclude that access to appellants' property in the manner required here is necessary to the promotion of state-protected rights of free speech and petition.

[9] Appellees contend that this issue is not properly before us because appellants have not met their burden of showing that it was raised in the state courts. It is well settled that in challenging the validity of a state law on the ground that it is repugnant to the Constitution of the United States, "[n]o particular form of words or phrases is essential, but only that the claim of invalidity on the ground therefor be brought to the attention of the state court with fair precision and in due time. And if the record as a whole shows either expressly or by clear intendment that this was done, the claim is to be regarded as having been adequately presented." *New York ex rel. Bryant* v. *Zimmerman,* 278 U. S., at 67.

Before the Supreme Court of California, appellants argued:

"The constitutional right to exclude potential communicants from private property is inextricably intertwined with the right of the property owner

state that in *Wooley* v. *Maynard,* 430 U. S. 705 (1977), this Court concluded that a State may not constitutionally require an individual to participate in the dissemination of an ideologi-

---

to select the way he wishes to use his property. . . . The right, which has been recognized as deriving from the owner's status as owner, also derives from the owner's status as himself a potential communicant. Defendant urges that his constitutional right to free speech would be infringed if he were required to make his property available to others for the purpose of their expressive activity." Brief in Response to *Amici Curiae* Briefs in No. S. F. 23812, p. 39 (Sup. Ct. Cal.).

In making this argument appellants explicitly relied on *Wooley* v. *Maynard,* 430 U. S. 705 (1977), and *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624 (1943). Brief in Response to *Amici Curiae* Briefs, *supra,* at 40–42. Before this Court appellants contend that "[t]he constitutional rights of private property owners also have their origins in the First Amendment right of the property owner not to be forced by the state to use his property as a forum for the speech of others." Brief for Appellants 12. See also Juris. Statement 12. And appellants throughout this litigation have been asserting their federal constitutional right to prohibit public expressive activity on their property that is not directly related to PruneYard's commercial purposes.

In addition, this Court has held federal claims to have been adequately presented even though not raised in lower state courts when the highest state court renders an unexpected interpretation of state law or reverses its prior interpretation. *Brinkerhoff-Faris Trust & Savings Co.* v. *Hill,* 281 U. S. 673, 677–678 (1930); *Missouri ex rel. Missouri Ins. Co.* v. *Gehner,* 281 U. S. 313, 320 (1930); *Saunders* v. *Shaw,* 244 U. S. 317, 320 (1917). Here prior to its decision below, the California Supreme Court had expressly decided to follow *Lloyd Corp.* v. *Tanner,* 407 U. S. 551 (1972), in defining the scope of state constitutional rights of free speech and petition. *Diamond II,* 11 Cal. 3d, at 335, 521 P. 2d, at 463. It was not until the instant case that the California Supreme Court overruled *Diamond II, supra,* and held that the California Constitution can and does require shopping center owners to grant access to individuals exercising their state rights of free expression and petition.

Prior to reaching the California Supreme Court, appellants argued that the *Diamond II* decision bound the California Superior Court and Court of Appeal to rule in appellants' favor. Appellants prevailed in these courts, and *Diamond II* was held to be controlling. Once before the California Supreme Court, as noted above, appellants explicitly presented

cal message by displaying it on his private property in a manner and for the express purpose that it be observed and read by the public. This rationale applies here, they argue, because the message of *Wooley* is that the State may not force an individual to display any message at all.

*Wooley,* however, was a case in which the government itself prescribed the message, required it to be displayed openly on appellee's personal property that was used "as part of his daily life," and refused to permit him to take any measures to cover up the motto even though the Court found that the display of the motto served no important state interest. Here, by contrast, there are a number of distinguishing factors. Most important, the shopping center by choice of its owner is not limited to the personal use of appellants. It is instead a business establishment that is open to the public to come and go as they please. The views expressed by members of the public in passing out pamphlets or seeking signatures for a petition thus will not likely be identified with those of the owner. Second, no specific message is dictated by the State to be displayed on appellants' property. There consequently is no danger of governmental discrimination for or against a particular message. Finally, as far as appears here appellants can expressly disavow any connection with the message by simply posting signs in the area where the speakers or handbillers stand. Such signs, for example, could disclaim any sponsorship of the message and could explain that the persons are communicating their own messages by virtue of state law.

Appellants also argue that their First Amendment rights have been infringed in light of *West Virginia State Board of*

---

their federal constitutional right to prohibit public expression on their property in terms of *Wooley* and *Barnette*. It was not until that time that they could have reasonably expected that the validity of the earlier *Diamond II* decision would be questioned. In these circumstances we conclude that appellants have adequately raised the federal question.

*Education* v. *Barnette,* 319 U. S. 624 (1943), and *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974). *Barnette* is inapposite because it involved the compelled recitation of a message containing an affirmation of belief. This Court held such compulsion unconstitutional because it "require[d] the individual to communicate by word and sign his acceptance" of government-dictated political ideas, whether or not he subscribed to them. 319 U. S., at 633. Appellants are not similarly being compelled to affirm their belief in any governmentally prescribed position or view, and they are free to publicly dissociate themselves from the views of the speakers or handbillers.

*Tornillo* struck down a Florida statute requiring a newspaper to publish a political candidate's reply to criticism previously published in that newspaper. It rests on the principle that the State cannot tell a newspaper what it must print. The Florida statute contravened this principle in that it "exact[ed] a penalty on the basis of the content of a newspaper." 418 U. S., at 256. There also was a danger in *Tornillo* that the statute would "dampe[n] the vigor and limi[t] the variety of public debate" by deterring editors from publishing controversial political statements that might trigger the application of the statute. *Id.,* at 257. Thus, the statute was found to be an "intrusion into the function of editors." *Id.,* at 258. These concerns obviously are not present here.

We conclude that neither appellants' federally recognized property rights nor their First Amendment rights have been infringed by the California Supreme Court's decision recognizing a right of appellees to exercise state-protected rights of expression and petition on appellants' property. The judgment of the Supreme Court of California is therefore

*Affirmed.*

MR. JUSTICE BLACKMUN joins the opinion of the Court except that sentence thereof, *ante,* at 84, which reads: "Nor

as a general proposition is the United States, as opposed to the several States, possessed of residual authority that enables it to define 'property' in the first instance."

MR. JUSTICE MARSHALL, concurring.

I join the opinion of the Court, but write separately to make a few additional points.

## I

In *Food Employees* v. *Logan Valley Plaza*, 391 U. S. 308 (1968), this Court held that the First and Fourteenth Amendments prevented a state court from relying on its law of trespass to enjoin the peaceful picketing of a business enterprise located within a shopping center. The Court concluded that because the shopping center "serves as the community business block" and is open to the general public, "the State may not delegate the power, through the use of its trespass laws, wholly to exclude those members of the public wishing to exercise their First Amendment rights on the premises." *Id.,* at 319. The Court rejected the suggestion that such an abrogation of the state law of trespass would intrude on the constitutionally protected property rights of shopping center owners. And it emphasized that the shopping center was open to the public and that reasonable restrictions on the exercise of communicative activity would be permitted. "[N]o meaningful claim to protection of a right of privacy can be advanced by respondents here. Nor on the facts of the case can any significant claim to protection of the normal business operation of the property be raised. Naked title is essentially all that is at issue." *Id.,* at 324.

The Court in *Logan Valley* emphasized that if the property rights of shopping center owners were permitted to overcome the First Amendment rights of prospective petitioners, a significant intrusion on communicative activity would result. Because "[t]he large-scale movement of this country's population from the cities to the suburbs has been accompanied

by the advent of the suburban shopping center," a contrary decision would have "substantial consequences for workers seeking to challenge substandard working conditions, consumers protesting shoddy or overpriced merchandise, and minority groups seeking nondiscriminatory hiring policies." *Ibid.* In light of these realities, we concluded that the First and Fourteenth Amendments prohibited the State from using its trespass laws to prevent the exercise of expressive activities on privately owned shopping centers, at least when those activities were related to the operations of the store at which they were directed.

In *Lloyd Corp.* v. *Tanner,* 407 U. S. 551 (1972), the Court confined *Logan Valley* to its facts, holding that the First and Fourteenth Amendments were not violated when a State prohibited petitioning that was not designed to convey information with respect to the operation of the store that was being picketed. The Court indicated that a contrary result would constitute "an unwarranted infringement of property rights." 407 U. S., at 567. And in *Hudgens* v. *NLRB,* 424 U. S. 507 (1976), the Court concluded that *Lloyd* had in fact overruled *Logan Valley.*

I continue to believe that *Logan Valley* was rightly decided, and that both *Lloyd* and *Hudgens* were incorrect interpretations of the First and Fourteenth Amendments. State action was present in all three cases. In all of them the shopping center owners had opened their centers to the public at large, effectively replacing the State with respect to such traditional First Amendment forums as streets, sidewalks, and parks. The State had in turn made its laws of trespass available to shopping center owners, enabling them to exclude those who wished to engage in expressive activity on their premises.[1]

---

[1] In this respect the cases resembled *Shelley* v. *Kraemer,* 334 U. S. 1 (1948), and *New York Times Co.* v. *Sullivan,* 376 U. S. 254 (1964), in which the common-law rules of contract and tort were held to constitute state action for Fourteenth Amendment purposes.

Rights of free expression become illusory when a State has operated in such a way as to shut off effective channels of communication. I continue to believe, then, that "the Court's rejection of any role for the First Amendment in the privately owned shopping center complex stems . . . from an overly formalistic view of the relationship between the institution of private ownership of property and the First Amendment's guarantee of freedom of speech." *Hudgens* v. *NLRB, supra,* at 542 (dissenting opinion).

## II

In the litigation now before the Court, the Supreme Court of California construed the California Constitution to protect precisely those rights of communication and expression that were at stake in *Logan Valley, Lloyd,* and *Hudgens.* The California court concluded that its State "[C]onstitution broadly proclaims speech and petition rights. Shopping centers to which the public is invited can provide an essential and invaluable forum for exercising those rights." 23 Cal. 3d 899, 910, 592 P. 2d 341, 347 (1979). Like the Court in *Logan Valley,* the California court found that access to shopping centers was crucial to the exercise of rights of free expression. And like the Court in *Logan Valley,* the California court rejected the suggestion that the Fourteenth Amendment barred the intrusion on the property rights of the shopping center owners. I applaud the court's decision, which is a part of a very healthy trend of affording state constitutional provisions a more expansive interpretation than this Court has given to the Federal Constitution. See Brennan, State Constitutions and the Protection of Individual Rights, 90 Harv. L. Rev. 489 (1977).

Appellants, of course, take a different view. They contend that the decision below amounts to a constitutional "taking" or a deprivation of their property without due process of law. *Lloyd,* they claim, did not merely overrule *Logan*

*Valley's* First Amendment holding; it overruled its due process ruling as well, recognizing a federally protected right on the part of shopping center owners to enforce the pre-existing state law of trespass by excluding those who engage in communicative activity on their property. In my view, the issue appellants present is largely a restatement of the question of whether and to what extent a State may abrogate or modify common-law rights. Although the cases in this Court do not definitively resolve the question, they demonstrate that appellants' claim has no merit.

Earlier this Term, in *Martinez* v. *California,* 444 U. S. 277 (1980), the Court was also confronted with a claim that the abolition of a cause of action previously conferred by state law was an impermissible taking of "property." We responded that even if a pre-existing state-law remedy "is a species of 'property' protected by the Due Process Clause . . . , it would remain true that the State's interest in fashioning its own rules of tort law is paramount to any discernible federal interest, except perhaps an interest in protecting the individual citizen from state action that is wholly arbitrary or irrational." *Id.,* at 281–282. Similarly, in the context of a claim that a guest statute impermissibly abrogated common-law rights of tort, the Court observed that the Due Process Clause does not forbid the "creation of new rights, or the abolition of old ones recognized by the common law, to attain a permissible legislative object." *Silver* v. *Silver,* 280 U. S. 117, 122 (1929). And in *Munn* v. *Illinois,* 94 U. S. 113 (1877), the Court upheld a statute limiting the permissible rate for the warehousing of grain. "A person has no property, no vested interest, in any rule of the common law. . . . Rights of property which have been created by the common law cannot be taken away without due process; but the law itself, as a rule of conduct, may be changed at the will . . . of the legislature, unless prevented by constitutional limitations. Indeed, the great office of statutes is to remedy defects in the

common law as they are developed, and to adapt it to the changes of time and circumstances." *Id.*, at 134. See also *Second Employers' Liability Cases*, 223 U. S. 1, 50 (1912); *Crowell* v. *Benson*, 285 U. S. 22, 41 (1932).

Appellants' claim in this case amounts to no less than a suggestion that the common law of trespass is not subject to revision by the State, notwithstanding the California Supreme Court's finding that state-created rights of expressive activity would be severely hindered if shopping centers were closed to expressive activities by members of the public. If accepted, that claim would represent a return to the era of *Lochner* v. *New York*, 198 U. S. 45 (1905), when common-law rights were also found immune from revision by State or Federal Government. Such an approach would freeze the common law as it has been constructed by the courts, perhaps at its 19th-century state of development. It would allow no room for change in response to changes in circumstance. The Due Process Clause does not require such a result.

On the other hand, I do not understand the Court to suggest that rights of property are to be defined solely by state law, or that there is no federal constitutional barrier to the abrogation of common-law rights by Congress or a state government. The constitutional terms "life, liberty, and property" do not derive their meaning solely from the provisions of positive law. They have a normative dimension as well, establishing a sphere of private autonomy which government is bound to respect.[2] Quite serious constitutional questions might be raised if a legislature attempted to abolish certain

---

[2] This understanding is embodied in cases in the procedural due process area holding that at least some "grievous losses" amount to deprivation of "liberty" or "property" within the meaning of the Due Process Clause, even if those losses are not protected by statutory or common law. See *Vitek* v. *Jones*, 445 U. S. 480, 488–489 (1980), and cases cited; *Mathews* v. *Eldridge*, 424 U. S. 319, 333 (1976). See also *Meachum* v. *Fano*, 427 U. S. 215, 229 (1976) (STEVENS, J., dissenting).

94

categories of common-law rights in some general way. Indeed, our cases demonstrate that there are limits on governmental authority to abolish "core" common-law rights, including rights against trespass, at least without a compelling showing of necessity or a provision for a reasonable alternative remedy.[3]

That "core" has not been approached in this case. The California Supreme Court's decision is limited to shopping centers, which are already open to the general public. The owners are permitted to impose reasonable restrictions on expressive activity. There has been no showing of interference with appellants' normal business operations. The California court has not permitted an invasion of any personal sanctuary. Cf. *Stanley* v. *Georgia,* 394 U. S. 557 (1969). No rights of privacy are implicated. In these circumstances

---

[3] For example, in *Ingraham* v. *Wright,* 430 U. S. 651 (1977), the Court found a constitutional liberty interest in freedom from corporal punishment, in large part on the ground that that interest was protected at common law. The Court stated that the "Due Process Clause . . . was intended to give Americans at least the protection against governmental power that they had enjoyed as Englishmen against the power of the Crown. The liberty preserved from deprivation without due process included the right 'generally to enjoy those privileges long recognized at common law as essential to the orderly pursuit of happiness by free men.' " *Id.,* at 672–673 (citation omitted). In *Duke Power Co.* v. *Carolina Environmental Study Group,* 438 U. S. 59, 88 (1978), the Court reserved the question whether in creating a compensation scheme for victims of nuclear accidents, Congress was constitutionally obliged to "provide a reasonable substitute remedy" for the abrogation of common-law rights of tort. Similarly, in *New York Central R. Co.* v. *White,* 243 U. S. 188, 201 (1917), the Court expressed uncertainty as to whether "a State might, without violence to the constitutional guaranty of 'due process of law,' suddenly set aside all common-law rules respecting liability as between employer and employee, without providing a reasonably just substitute," and "doubted whether the State could abolish all rights of action on the one hand, or all defenses on the other, without setting up something adequate in their stead."

there is no basis for strictly scrutinizing the intrusion authorized by the California Supreme Court.

I join the opinion of the Court.

MR. JUSTICE WHITE, concurring in part and concurring in the judgment.

I join MR. JUSTICE POWELL's concurring opinion but with these additional remarks.

The question here is whether the Federal Constitution forbids a State to implement its own free-speech guarantee by requiring owners of shopping centers to permit entry on their property for the purpose of communicating with the public about subjects having no connection with the shopping centers' business. The Supreme Court of California held that in the circumstances of this case the federally protected property rights of appellants were not infringed. The state court recognized, however, that reasonable time and place limitations could be imposed and that it was dealing with the public or common areas in a large shopping center and not with an individual retail establishment within or without the shopping center or with the property or privacy rights of a homeowner. On the facts before it, "[a] handful of additional orderly persons soliciting signatures and distributing handbills ... would not markedly dilute defendant's property rights." 23 Cal. 3d 899, 911, 592 P. 2d 341, 347–348 (1979).

I agree that on the record before us there was not an unconstitutional infringement of appellants' property rights. But it bears pointing out that the Federal Constitution does not require that a shopping center permit distributions or solicitations on its property. Indeed, *Hudgens* v. *NLRB*, 424 U. S. 507 (1976), and *Lloyd Corp.* v. *Tanner*, 407 U. S. 551 (1972), hold that the First and Fourteenth Amendments do not prevent the property owner from excluding those who would demonstrate or communicate on his property. Insofar as the Federal Constitution is concerned, therefore, a State may

decline to construe its own constitution so as to limit the property rights of the shopping center owner.

The Court also affirms the California Supreme Court's implicit holding that appellants' own free-speech rights under the First and Fourteenth Amendments were not infringed by requiring them to provide a forum for appellees to communicate with the public on shopping center property. I concur in this judgment, but I agree with MR. JUSTICE POWELL that there are other circumstances that would present a far different First Amendment issue. May a State require the owner of a shopping center to subsidize any and all political, religious, or social-action groups by furnishing a convenient place for them to urge their views on the public and to solicit funds from likely prospects? Surely there are some limits on state authority to impose such requirements; and in this respect, I am not in entire accord with Part V of the Court's opinion.

MR. JUSTICE POWELL, with whom MR. JUSTICE WHITE joins, concurring in part and in the judgment.

Although I join the judgment, I do not agree with all of the reasoning in Part V of the Court's opinion. I join Parts I–IV on the understanding that our decision is limited to the type of shopping center involved in this case. Significantly different questions would be presented if a State authorized strangers to picket or distribute leaflets in privately owned, freestanding stores and commercial premises. Nor does our decision today apply to all "shopping centers." This generic term may include retail establishments that vary widely in size, location, and other relevant characteristics. Even large establishments may be able to show that the number or type of persons wishing to speak on their premises would create a substantial annoyance to customers that could be eliminated only by elaborate, expensive, and possibly unenforceable time, place, and manner restrictions. As the Court observes, state power to regulate private property is limited to the adoption of reasonable restrictions that "do not amount to a taking without

just compensation or contravene any other federal constitutional provision." *Ante,* at 81.

## I

Restrictions on property use, like other state laws, are invalid if they infringe the freedom of expression and belief protected by the First and Fourteenth Amendments. In Part V of today's opinion, the Court rejects appellants' contention that "a private property owner has a First Amendment right not to be forced by the State to use his property as a forum for the speech of others." *Ante,* at 85. I agree that the owner of this shopping center has failed to establish a cognizable First Amendment claim in this case. But some of the language in the Court's opinion is unnecessarily and perhaps confusingly broad. In my view, state action that transforms privately owned property into a forum for the expression of the public's views could raise serious First Amendment questions.

The State may not compel a person to affirm a belief he does not hold. See *Wooley* v. *Maynard,* 430 U. S. 705 (1977); *West Virginia State Board of Education* v. *Barnette,* 319 U. S. 624 (1943). Whatever the full sweep of this principle, I do not believe that the result in *Wooley* v. *Maynard, supra,* would have changed had the State of New Hampshire directed its citizens to place the slogan "Live Free or Die" in their shop windows rather than on their automobiles. In that case, we said that "[a] system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts." 430 U. S., at 714. This principle on its face protects a person who refuses to allow use of his property as a marketplace for the ideas of others. And I can find no reason to exclude the owner whose property is "not limited to [his] personal use. . . ." *Ante,* at 87. A person who has merely invited the public onto his property for commercial purposes cannot fairly be said to have relinquished his right to decline "to be

an instrument for fostering public adherence to an ideological point of view he finds unacceptable." *Wooley* v. *Maynard, supra,* at 715.[1]

As the Court observes, this case involves only a state-created right of limited access to a specialized type of property. *Ante,* at 87, 87–88. But even when no particular message is mandated by the State, First Amendment interests are affected by state action that forces a property owner to admit third-party speakers. In many situations, a right of access is no less intrusive than speech compelled by the State itself. For example, a law requiring that a newspaper permit others to use its columns imposes an unacceptable burden upon the newspaper's First Amendment right to select material for publication. *Miami Herald Publishing Co.* v. *Tornillo,* 418 U. S. 241 (1974). See also *Columbia Broadcasting System, Inc.* v. *Democratic National Committee,* 412 U. S. 94, 117 (1973) (plurality opinion). Such a right of access burdens the newspaper's "fundamental right to decide what to print or omit." *Wooley* v. *Maynard, supra,* at 714; see *Miami Herald Publishing Co.* v. *Tornillo, supra,* at 257. As such, it is tantamount to compelled affirmation and, thus, presumptively unconstitutional.[2]

---

[1] Cf. *Lloyd Corp.* v. *Tanner,* 407 U. S. 551, 569 (1972) ("property [does not] lose its private character merely because the public is generally invited to use it for designated purposes").

[2] Even if a person's own speech is not affected by a right of access to his property, a requirement that he lend support to the expression of a third party's views may burden impermissibly the freedoms of association and belief protected by the First and Fourteenth Amendments. In *Abood* v. *Detroit Board of Education,* 431 U. S. 209, 235 (1977), we held that a State may not require a person "to contribute to the support of an ideological cause he may oppose. . . ." To require a landowner to supply a forum for causes he finds objectionable also might be an unacceptable "compelled subsidization" in some circumstances. *Id.,* at 237; cf. *Central Hardware Co.* v. *NLRB,* 407 U. S. 539, 543–545 (1972) ("property rights" may permit exclusion of union organizers); *NLRB* v. *Babcock & Wilcox Co.,* 351 U. S. 105, 112 (1956) (same). See generally *Eastex, Inc.* v. *NLRB,* 437 U. S. 556, 571–576 (1978); *Hudgens* v. *NLRB,*

The selection of material for publication is not generally a concern of shopping centers. But similar speech interests are affected when listeners are likely to identify opinions expressed by members of the public on commercial property as the views of the owner. If a state law mandated public access to the bulletin board of a freestanding store, hotel, office, or small shopping center, customers might well conclude that the messages reflect the view of the proprietor. The same would be true if the public were allowed to solicit or distribute pamphlets in the entrance area of a store or in the lobby of a private building. The property owner or proprietor would be faced with a choice: he either could permit his customers to receive a mistaken impression or he could disavow the messages. Should he take the first course, he effectively has been compelled to affirm someone else's belief. Should he choose the second, he has been forced to speak when he would prefer to remain silent. In short, he has lost control over his freedom to speak or not to speak on certain issues. The mere fact that he is free to dissociate himself from the views expressed on his property, see *ante,* at 87, cannot restore his "right to refrain from speaking at all." *Wooley* v. *Maynard, supra,* at 714.

A property owner also may be faced with speakers who wish to use his premises as a platform for views that he finds morally repugnant. Numerous examples come to mind. A minority-owned business confronted with leaflet distributers from the American Nazi Party or the Ku Klux Klan, a church-operated enterprise asked to host demonstrations in favor of abortion, or a union compelled to supply a forum to right-to-work advocates could be placed in an intolerable position if state law requires it to make its private property available to anyone who wishes to speak. The strong emotions evoked by speech

---

424 U. S. 507, 521–522 (1976). The appellants do not argue, however, that *Abood* supports the claimed right to exclude speakers from their property. Nor have they alleged that they disagree with the messages at issue in this case. See *infra,* at 101.

in such situations may virtually compel the proprietor to respond.

The pressure to respond is particularly apparent when the owner has taken a position opposed to the view being expressed on his property. But an owner who strongly objects to some of the causes to which the state-imposed right of access would extend may oppose ideological activities "of any sort" that are not related to the purposes for which he has invited the public onto his property. See *Abood* v. *Detroit Board of Education,* 431 U. S. 209, 213, 241 (1977). To require the owner to specify the particular ideas he finds objectionable enough to compel a response would force him to relinquish his "freedom to maintain his own beliefs without public disclosure." *Ibid.*[3] Thus, the right to control one's own speech may be burdened impermissibly even when listeners will not assume that the messages expressed on private property are those of the owner.[4]

## II

One easily can identify other circumstances in which a right of access to commercial property would burden the owner's First and Fourteenth Amendment right to refrain from

---

[3] The problem is compounded where, as in shopping centers or in the lobby areas of hotels and office buildings, stores are leased to different proprietors with divergent views.

[4] In a proper case, the property owner also may be protected by the principle that "a State has no business telling a man, sitting alone in his own house, what books he may read or what films he may watch." *Stanley* v. *Georgia,* 394 U. S. 557, 565 (1969). Observing that a State has no interest in controlling the moral content of a person's thoughts, *ibid.,* the Court in *Stanley* invalidated a law imposing criminal penalties for the private possession of obscenity. *Stanley* prevents a State from removing from the home expressive materials that a person may wish to peruse privately. The same principle may extend to state action that forces individual exposure to third-party messages. Thus, a law that required homeowners to permit speakers to congregate on their front lawns would be a massive and possibly unconstitutional intrusion into personal privacy and freedom of belief. No such problem arises in this case.

speaking. But appellants have identified no such circumstance. Nor did appellants introduce evidence that would support a holding in their favor under either of the legal theories outlined above.

On the record before us, I cannot say that customers of this vast center would be likely to assume that appellees' limited speech activity expressed the views of the PruneYard or of its owner. The shopping center occupies several city blocks. It contains more than 65 shops, 10 restaurants, and a theater. Interspersed among these establishments are common walkways and plazas designed to attract the public. See *ante*, at 77, 83. Appellees are high school students who set up their card table in one corner of a central courtyard known as the "Grand Plaza." App. to Juris. Statement B–2. They showed passersby several petitions and solicited signatures. Persons solicited could not reasonably have believed that the petitions embodied the views of the shopping center merely because it owned the ground on which they stood.

Appellants have not alleged that they object to the ideas contained in the appellees' petitions. Nor do they assert that some groups who reasonably might be expected to speak at the PruneYard will express views that are so objectionable as to require a response even when listeners will not mistake their source. The record contains no evidence concerning the numbers or types of interest groups that may seek access to this shopping center, and no testimony showing that the appellants strongly disagree with any of them.

Because appellants have not shown that the limited right of access held to be afforded by the California Constitution burdened their First and Fourteenth Amendment rights in the circumstances presented, I join the judgment of the Court. I do not interpret our decision today as a blanket approval for state efforts to transform privately owned commercial property into public forums. Any such state action would raise substantial federal constitutional questions not present in this case.