**DISTRICT OF COLUMBIA,**
**et al., Appellants,**

v.

**Oliver T. CARR, Jr., et al., Appellees.**

**No. 91–CV–36.**

District of Columbia Court of Appeals.

Argued Oct. 4, 1991.
Decided April 28, 1992.

Lutz Alexander Prager, Asst. Deputy Corp. Counsel, with whom John Payton, Corp. Counsel, and, Charles L. Reischel, Deputy Corp. Counsel, Washington, D.C., were on the brief, for appellants.

William J. Utermohlen, with whom Richard A. Green, Washington, D.C., was on the brief, for appellees.

Before ROGERS, Chief Judge, and FERREN and WAGNER, Associate Judges.

FERREN, Associate Judge:

The District of Columbia appeals the trial court's judgment that the District violated the takings clause of the Fifth Amendment by using its distraint power in appellees' commercial building in a manner inconsistent with the lease agreement between appellees and the distrained tenant. Although concluding that the District acted within its statutory and constitutional authority under the government's taxing levy and distraint powers when it physically seized the tenant's store, the court further concluded that the District's failure to abide by the tenant's lease agreement was a compensable taking of appellees' property. Because we conclude the District's actions did not violate the Fifth Amendment, we reverse and remand for vacation of the trial court's order.

## I.

The essential facts were stipulated at trial. The appellees (the "landlord") are joint venturers, known as "The Square 106 Associates," who own International Square, an office and retail complex located at 1825 Eye Street, N.W. In 1982, Europa International Inc. (the "tenant") signed a seven-year lease for street-level retail space. On January 3, 1986, the landlord filed a complaint for possession of the premises because of the tenant's failure to pay rent. Subsequently, the tenant paid at least some of the back rent, and the landlord never completed the eviction proceedings.

For most of the period of its tenancy the tenant had failed to pay its District of

Columbia sales and use taxes, withholding taxes, personal property taxes, unincorporated business taxes, and unemployment compensation contributions. In April 1985, after an audit, the District determined that the tenant had not been paying its taxes and negotiated a payment schedule with the tenant. On Friday, May 9, 1986, while the tenant's store was open for business, the District served a Notice of Levy on the tenant because of its failure to adhere to the repayment schedule. At that time the tenant owed over $57,000 in back taxes. That same day the tenant gave the District a bank check for $8,000 and agreed to a new payment schedule. As a result, the District suspended enforcement efforts.

Three days later, however, the tenant requested the return of the bank check and indicated it intended to cancel its new payment agreement. Upon discovering the tenant had removed over half of its personal property from its store, a District agent seized the remaining property by changing the locks of the premises and posted official notices on the window of the store informing the public that the tenant's personalty had been seized for the account of the District of Columbia. The agent acted under the authority of D.C.Code §§ 47–1601 (distraint of goods and chattels), 47–1602 (storage of distrained property; manner of sale), and 47–1702 (distraint of personal property) (1990) (hereafter referred to collectively as distraint statutes). At the time of the seizure, the tenant was still in possession of the store and the lease.

On May 13, 1986, the day after the District seized the tenant's property, the tenant orally surrendered its remaining interest in the lease to the landlord. The landlord accepted the surrender and did not seek further compensation from the tenant. Between May 12 and June 1, 1986, the District spent time at the premises inspecting the seized property and preparing it for an auction sale. As required by D.C.Code § 47–1702, the District published legal notice on May 29, 30, and 31 in the Washington Post indicating the District would be auctioning the seized merchandise on the premises at noon on June 9, 1986. On June 2, however, the landlord notified the Dis-

trict by letter that it had removed the District's locks and had secured the store for itself. The letter asked the District to remove the seized property by 5:00 p.m. on June 9 or to pay the landlord for storage. The letter also made clear that the landlord would not permit the District to hold a public auction on the premises. On June 3, the District replaced the landlord's locks, retook possession of the premises, and continued to prepare for the June 9 scheduled auction.

On June 6 the landlord sought and obtained a temporary restraining order. That order permitted the District to maintain control over the premises but prohibited the auction or sale of the personal property. On June 10, Judge Alprin denied the landlord's motion for preliminary injunction after finding the landlord had failed to make the requisite showing of irreparable harm. The District subsequently maintained its locks on the premises, republished the statutorily required notices, and held its auction in the tenant's store on June 20.

On June 27, 1986, the landlord filed an amended complaint alleging that the District's occupation of the tenant's retail space from May 12 until June 20 prevented the landlord from earning rent on its property. It also alleged the District's distraint and sale had an "adverse effect" on the character of the building and on rental income from other tenants based on sales volume. The amended complaint demanded damages, attorneys' fees, a declaratory judgment, and a permanent injunction enjoining District seizures of tenant property at International Square and everywhere else the landlord has an ownership interest. The District's answer was accompanied by a counterclaim for $2,500 based on the landlord's interference with the distraint and sale of the tenant's assets. The case was called for trial three years later, and the parties filed a stipulation of facts with exhibits.

In July 1990, the trial court (Judge King) issued an order on liability only, concluding that although the District had a right to seize and sell the tenant's chattels, includ-

ing its lease, the District's enforcement of the distraint statutes did not give the District authority to violate the terms of the tenant's lease. The court held that the District's actions constituted a taking of the landlord's property because the seizure and sale of the tenant's personalty violated various terms of the lease between the landlord and tenant. The court refused to grant injunctive relief but on December 3, 1990 ordered judgment against the District for $3,843.30, consisting of $2,787.72 in rent from May 12 to June 20, 1986, and $1,055.58 in accrued interest. The District timely appealed.

## II.

The government's statutorily authorized levy, distraint (also known as distress), and seizure powers have long been considered a necessary and constitutional (though severe) summary administrative remedy for collecting back taxes from delinquent and recalcitrant taxpayers. *See generally* 84 C.J.S. *Taxation* §§ 686(b), 694–95 (1954). "Indeed, one may readily acknowledge that the existence of the levy power is an essential part of our self-assessment tax system and that it enhances voluntary compliance in the collection of taxes that [the Supreme Court] has described as 'the lifeblood of government, and their prompt and certain availability an imperious need.'" *G.M. Leasing Corp. v. United States*, 429 U.S. 338, 350, 97 S.Ct. 619, 627, 50 L.Ed.2d 530 (1977) (citing *Bull v. United States*, 295 U.S. 247, 259, 55 S.Ct. 695, 699, 79 L.Ed. 1421 (1935)).

■ "Taxes are creatures of statute and must necessarily be collected in the manner provided by the statute." *Tumulty v. District of Columbia*, 69 App.D.C. 390, 398,

102 F.2d 254, 262 (D.C.Cir.1939). "[T]he construction that has been placed upon the [tax] statute by the District since its enactment ... must unless it be plainly erroneous, receive due weight and consideration." *Id.*, 69 App.D.C. at 399, 102 F.2d at 263. The District asserts that, since the initial enactment of the Distraint Act, it has followed a policy of using the Act's seizure authority to padlock spaces leased by delinquent taxpayers and to use those spaces to auction the taxpayer's goods and interests when taxes remain unpaid after seizure. Such an auction is conducted without obtaining consent from, or offering to pay compensation to, the landlord. Appellees stipulated to the fact of that policy and do not challenge it.[1]

■ We turn now to the question whether the District's exercise of its statutory power in this particular case violated the takings clause of the Fifth Amendment. Under District law, the leasehold interest of a tenant is considered a "good" or "chattel" subject to seizure and sale under the Distraint Act. *See Stagecrafters' Club v. District of Columbia Div. of Am. Legion*, 94 U.S.App.D.C. 74, 75, 211 F.2d 811, 812 (1954); *see also Second Realty Corp. v. Fiore*, 65 A.2d 926, 927 (D.C.1949) (lease constitutes personal property and passes to estate administrator of deceased leaseholder). Whatever interest the tenant has in the lease, therefore, is subject to seizure and sale, like any other chattel, in order to satisfy the tenant's tax account.[2]

Recognizing the above principles, the trial court concluded that the government, after lawfully seizing the tenant's leasehold interest and rights, could not use the leasehold in a manner that exceeded the limits of that interest, *i.e.*, exceeded the terms and conditions of the lease. The

---

1. Although D.C.Code § 47–1602 (1990) does not expressly authorize public auctions on tenant premises pursuant to levy and distraint, it does state: "When the Mayor distrains goods and chattel to enforce the payment of tax, the goods and chattel seized shall be kept in a safe and convenient place until the sale of the property. The sale shall be at public auction, at a place chosen by the Mayor." The broad language *delegates considerable discretionary authority* to the Mayor to authorize the storage and sale of a tenant's possessions on leased premises;

provided, of course, that such storage and sale do not run afoul of other statutory or constitutional requirements.

2. Because the District in this case did not attempt to sell the tenant's interest in the lease or possess or occupy the premises beyond the time it needed to conduct its auction, we do not comment on the legality or consequences of such a sale or occupation.

trial court further concluded that the District had violated at least one term of the lease, the obligation to pay rent,[3] and thus held that the violation of that lease provision amounted to an unconstitutional taking.

Although we agree with the trial court and the appellees that the District was not entitled to seize or appropriate the landlord's rights or interests without just compensation, we conclude that the District did not do so. Clearly, the landlord had a right under the lease to receive rent on its property. The party who held the corresponding obligation under the lease to pay the rent, however, was the tenant, not the District. The tenant was in possession of the premises on May 12, 1986 when the District exercised its distraint powers. The District's actions were directed against the possessory rights of the tenant, not against the reversionary rights of the landlord. *Hudson Valley Sand & Stone Co., Inc. v. State,* 57 A.D.2d 344, 345, 395 N.Y.S.2d 507, 508 (N.Y.App.Div.1977), *aff'd,* 44 N.Y.2d 829, 406 N.Y.S.2d 456, 377 N.E.2d 987 (1978); *cf. Alamo Land & Cattle Co. v. Arizona,* 424 U.S. 295, 303, 96 S.Ct. 910, 916, 47 L.Ed.2d 1 (1976) (When a leasehold interest in land is entitled to just compensation upon condemnation of the land, the underlying land trust "must receive the then full value of the reversionary interest" and "the value of the rental rights under the lease."). The District occupied the store pursuant to its lawful seizure of the tenant's leasehold rights; "[t]he State thus held possession against the tenants, not against the [landlord] claimants." *Marrano v. State,* 80 Misc.2d 768, 771, 364 N.Y.S.2d 751, 755 (N.Y.Ct.Cl.1975).[4]

Conceptually, in this case, there was no entry affecting a reversionary interest, warranting compensation to the landlord. *See supra* note 2; *cf. Alamo Land & Cattle Co.,* 424 U.S. at 303, 96 S.Ct. at 916. Rather, the District merely entered the tenant's premises as a statutory licensee to levy against the tenant's chattels, including the lease, as needed to satisfy taxes, without taking an estate in land (even as sublessee) or assuming any obligation to take over the tenant's obligation to pay rent to the landlord. The fact that the landlord subsequently accepted the tenant's surrender of the lease means only that the landlord accepted a surrender subject to the

---

**3.** Appellees raised below and raise again on appeal three alleged violations of the lease: nonpayment of rent, use of the leased premises for storage and auction instead of retail sales, and posting of signs on the windows without prior approval. Because the trial court only awarded damages calculated by reference to unpaid rent for the period the District occupied the premises, and because appellees presented no evidence as to damages other than loss of rent, we do not consider whether the use of the premises for storage, auction, and notice-posting could amount to a taking under the Fifth Amendment. The Supreme Court has stated, however, that "it is well established that 'not every destruction or injury to property by governmental action has been held to be a 'taking' in the constitutional sense.'" *PruneYard Shopping Center v. Robins,* 447 U.S. 74, 82, 100 S.Ct. 2035, 2041, 64 L.Ed.2d 741 (1980) (quoting *Armstrong v. United States,* 364 U.S. 40, 48, 80 S.Ct. 1563, 1568, 4 L.Ed.2d 1554 (1960)); *see also Transp. Co. v. Chicago,* 99 U.S. 635, 25 L.Ed. 336 (1878) (damages to adjoining property caused by municipal corporation's road improvement activities not a taking).

**4.** In a letter to the tenant dated May 13, 1986, the appellees acknowledged the relative status of each of the three parties with respect to the lease: "[we] will reenter the premises as of the date the District of Columbia relinquishes possession, and will thereupon attempt to relet the premises on [tenant's] behalf." This letter, confirming a conversation between counsel for the landlord and counsel for the tenant, appears to be the basis for the parties' stipulation of fact at trial that the landlord accepted the tenant's surrender of its remaining leasehold interest. Apparently, appellees recognized the District's right pursuant to its distraint power over the tenant's leasehold interest to be in temporary possession of the premises, and the tenant's continuing obligation to pay rent until the landlord could find a new tenant.

This is consistent with a landlord's options under RESTATEMENT (SECOND) LANDLORD & TENANT § 12.1(3) (1977) when a tenant attempts to surrender the lease. According to comment i, the landlord may, for example: accept the surrender and hold the tenant liable for any damages; accept the surrender and give notice that the tenant will be liable for the difference between what the tenant would have had to pay and what the landlord can get upon reletting; or reject the surrender and inform the tenant that the landlord will attempt to relet the premises on the tenant's account, holding the tenant responsible for any difference. *See id.* at reporter's note 8.

District's prior statutory seizure of the portion of the leasehold interest necessary to satisfy the tenant's tax objections; it does not mean the landlord and tenant somehow effected a novation of the lease—subsequent to the seizure—which retroactively created an obligation of the District to pay rent that it was not obliged to pay before the surrender.

In sum, the District's temporary seizure of the leased premises because of the tenant's tax delinquency did not terminate the tenant's rental obligations. Nor did the tenant's surrender of its remaining interest in the lease on May 13 and the landlord's acceptance of that surrender transfer the rental obligation under the lease to the District.[5] If the landlord subsequently relieved the tenant from further rental obligations (an issue not presented or addressed here), then it was the landlord, not the District, who nullified the landlord's right to receive rent for the period of the District's use of the store. *See Hudson Valley,* 395 N.Y.S.2d at 509 (landlord was able to proceed in any lawful manner against distrained tenant and failure to do so amounted to "sleeping on its rights").

Appellees rely on various federal court decisions to support its position that the District owes rent for its use of the store even if the tenant was technically still in possession. *E.g., Smith v. United States,* 458 F.2d 1231 (9th Cir.1972); *American Oil Co. v. United States,* 383 F.Supp. 1281 (N.D.Okla.1974); *Maryland Nat'l Bank v. United States,* 227 F.Supp. 504 (D.Md. 1964); *Feldwin Realty Co. v. United States,* 169 F.Supp. 73 (D.N.J.1959). We find these cases unpersuasive and inapposite. First, each of these cases concerned Internal Revenue Service agents operating under federal regulations. Those regulations specifically required collection officers to obtain the landlord's permission to secure and store the tenant's personalty whether or not the tenant was still in possession or, in the alternative, to arrange a reasonable charge for storage with the landlord. *See, e.g., Feldwin Realty,* 169

F.Supp. at 74–75; *American Oil,* 383 F.Supp. at 1286. Based on the federal regulations, and in two cases based in part on the government's express promise to pay the landlord, *Maryland Nat'l Bank,* 227 F.Supp. at 506; *Feldwin Realty,* 169 F.Supp. at 75, these courts found sufficient contractual intent on the part of the I.R.S. to enforce against the government an implied-in-fact contract. No such implied contract exists in this case; nor can we find a governmental intent to pay under the District distraint statutes.

Second, in several of the cases on which the landlord relies a dispositive fact was that the landlord either had actual possession or was entitled by law to possession of the seized premises. *See Smith,* 458 F.2d at 1233 (Arizona law permitted landlord to reenter premises without notice or demand after distrained tenant fell in arrears on rent in month-to-month tenancy); *Feldwin Realty,* 169 F.Supp. at 73 (government levy on property of former tenant). In contrast, in this case there is no question that the tenant was still in possession at the time of the government's seizure and that the landlord did not have a right of entry without first going through judicial process. Although the landlord had begun that process, it had not completed it at the time the District invoked its distraint powers. We therefore conclude that the District had no obligation to pay rent to the landlord under the lease under any theory.

This is not to imply that the District did not owe some duty to the landlord appellees; it owed them the same duties it owes to every citizen, including the duty not to violate appellees' rights under the takings clause of the Fifth Amendment. As we have already stated, however, the District entered the leased premises pursuant to its legitimate authority to seize the tenant's goods and chattels, including, in this case, temporary seizure of the leasehold interest. By exercising its legitimate authority, the District did not invade the private property of the landlord, even as-

---

**5.** We do not have occasion to decide here whether the government owes the tenant a rea- sonable fee for use and storage during the distraint period.

suming the District did commit minor infractions of the lease agreement between the landlord and tenant.[6] Furthermore, under the distraint statutes "the Collector is under a duty to act fairly toward the public, to provide reasonable opportunity for the payment of taxes assessed, and to limit costs and expenses to what is reasonable and necessary." *Pearson v. Laughlin,* 89 U.S.App.D.C. 130, 134, 190 F.2d 658, 662 (1951). We cannot say on the record before us that using the tenant's leasehold rights and interest to store and auction the tenant's goods was not a reasonable way for the District to limit costs to both the public and the tenant while providing the tenant with "reasonable opportunity" to meet its tax burden before the auction. We therefore conclude that the District's actions were not a taking in violation of the Fifth Amendment.[7]

Accordingly, we reverse the trial court's judgment that the District's actions constituted an unlawful taking in violation of the Fifth Amendment, and we vacate its subsequent order entering judgment in favor of appellees for $3,843.30 plus costs.

*Reversed and remanded.*

---

6. *See supra* note 3. We note that the lease contains a provision which states: "This Lease and the rights and obligations of Lessor and Lessee hereunder shall be governed by the laws of the jurisdiction in which the Building is located." On its face it would appear that this "governing law" clause made the terms of the lease subject to lawful government distraint actions that might result in reasonable intrusions on the interests of one or both parties. *Cf. Penn Central Transp. Co. v. New York City,* 438 U.S. 104, 98 S.Ct. 2646, 57 L.Ed.2d 631 (1978) (zoning ordinance restricting development rights did

not interfere with interests sufficiently bound up with "reasonable expectations" of claimant to constitute taking).

7. We thus do not reach the question whether appellees' filing of the temporary and preliminary injunction actions, causing the District to delay its auction and extend its occupation of the tenant's premises, decreased the number of days appellees were entitled to rent or damages from the District.