FALK v STATE BAR OF MICHIGAN

Docket No. 60722. Argued March 8, 1983 (Calendar No. 14).—Decided December 29, 1983. Rehearing denied *post*, 1203. Certiorari denied by the Supreme Court of the United States on October 29, 1984.

Allan Falk, a member of the State Bar of Michigan, brought an original action for special relief in the Supreme Court against the State Bar of Michigan which the Court treated as an action for a writ of superintending control. The plaintiff sought to be relieved of paying that portion of his State Bar dues relating to activities of the bar which he alleged were an unlawful and unconstitutional infringement on his First Amendment rights. No majority of the justices of the Court reached consensus for final disposition of the case, but a majority agreed that the matter should be referred to a master appointed to conduct an additional evidentiary hearing to develop a more complete record with regard to the Young Lawyers Section of the bar and the Lawyers Wives of Michigan, the bar's Lawyer Placement Service, the commercial sale of the bar's mailing list, and bar activities addressed to influencing legislation. 411 Mich 63 (1981). After further findings were made, there was another briefing and argument.

In a unanimous opinion per curiam, the Supreme Court *held:*

A majority of the Court is not persuaded that the plaintiff is entitled to the relief prayed for in his "Petition for Special Relief". However, because the proceeding convinced the Court that certain practices of the State Bar may warrant closer scrutiny, the Court, pursuant to its duty to superintend the bar,

REFERENCES FOR POINTS IN HEADNOTES
[1] 51 Am Jur 2d, Lobbying § 2.
[2] 16 Am Jur 2d, Constitutional Law § 351.
[3] [No reference]
[4] 16 Am Jur 2d, Constitutional Law § 348.
[5, 7] 7 Am Jur 2d, Attorneys at Law §§ 2, 7.
[5, 8] 16 Am Jur 2d, Constitutional Law § 112.
[6, 11] 7 Am Jur 2d, Attorneys at Law § 7.
[9] 7 Am Jur 2d, Attorneys at Law § 70.
[10] [No reference]
[12] [No reference]
[13] [No reference]

will appoint a committee to review those practices and activities and make recommendations to the Court.

Petition dismissed.

The justices also wrote separate opinions to express their views.

Justice Boyle, joined by Chief Justice Williams, wrote that the State Bar of Michigan may constitutionally use the compulsory dues of its members to support lobbying and other political activities as presently conducted and to support and promote non-political activities such as certain activities of the Young Lawyers Section and the Lawyers Wives, prepaid legal services, lawyer placement services, and social functions. Although the plaintiff's First Amendment interests have been infringed by the bar's political activities, the interest of the government in those activities outweighs the injury. The plaintiff has not shown a protected First Amendment interest in the bar's non-political activities.

1. The plaintiff asserts rights of non-association and non-expression. Such rights have been afforded protection under the First Amendment by the Supreme Court of the United States in limited circumstances. Strict scrutiny, however, has not been applied to determine whether they have been violated. Rather, the Court has balanced the severity of the injury to a person's First Amendment interests with the significance of the government's interest in a requirement or regulation. The approach employs a sliding scale. The more serious the infringement of individual interests, the more vital the government interest has to be to outweigh the infringement.

2. The plaintiff has not met the burden of proving that the non-political activities of the bar have infringed on a protected First Amendment interest. None of the activities of which he complains may fairly be characterized as compelled expression. Rather, his objection is that the dues spent on these activities have returned no economic benefit to him, an interest which has no basis in the First Amendment. Any ideological content in the activities would be too attenuated to burden the plaintiff's freedom of conscience. In addition, the challenged non-political activities are fairly within the functions of an integrated bar.

3. The plaintiff has suffered a cognizable injury to his First Amendment right of freedom of expression insofar as bar dues are used to render advice on the content of or to support or oppose legislation. To the extent that bar dues are used to support such activity, the plaintiff is compelled to participate in political expression of the bar even though he may be opposed

to the bar's position or would choose to take no position. His freedom of conscience and intellect have been invaded. However, the severity of the infringement is not great. The plaintiff is not being forced to express personal agreement with the bar; his support is only in the form of indirect financial contributions. On the other hand, the interest of the government in receiving the counsel of the State Bar with respect to legislation is great. Lawyers are in the business of knowing, understanding, utilizing, and interpreting the law; their collective wisdom is of broad interest to the government.

Justice Kavanagh, joined by Justice Levin, concurred in the disposition. Because the proceeding is not a lawsuit or an action delineated by statute, court rule, or precedent, determination of the constitutional issues is inappropriate and should await a proceeding where such determination is necessary.

Justice Ryan, joined by Justices Brickley and Cavanagh, wrote that the State of Michigan, through the combined actions of the Supreme Court, the Legislature, and the State Bar, may compulsorily exact dues, and require association of attorneys, to support only those duties and functions of the State Bar which serve a compelling state interest and which cannot be accomplished by means less intrusive upon the First Amendment rights of objecting attorneys.

1. The regulation of the practice of law, the maintenance of high standards in the legal profession, and the discharge of the profession's duty to protect and inform the public are purposes in which the State of Michigan has a compelling interest justifying unavoidable intrusions on the First Amendment rights of attorneys. On the other hand, political and legislative activities are impermissible intrusions, as are activities designed to further commercial and economic interests of the members of the bar.

2. The issue of the commercial sale of the State Bar mailing list is moot inasmuch as bar members have the opportunity to remove their names from the mailing list. Likewise, the issue of membership in the Young Lawyers Section is moot because, although membership is automatic by virtue of age or years since admission to the bar, members may disassociate themselves. However, as with activities of the bar in general, those activities which are legislative or political or are designed primarily to further the economic opportunities of young lawyers are impermissible, while purely educational activities or those designed to make legal services more accessible are not prohibited. Thus, Prison Legal Services of Michigan, Inc., the Committee for Provision of Legal Services to the Elderly, and

the Child Advocacy Committee are permissible, while the State Bar Juvenile Law Committee (legislative activity) and the Prepaid Legal Services Committee (economic activity) are not. By the same standard, the Lawyers Wives organization and its educational activities such as Law Day are constitutionally permissible.

3. The State Bar should be enjoined from disbursing compulsorily exacted dues for any functions or purposes other than: all regulatory activities; all continuing legal education activities which are directed to the maintenance of high professional standards among Michigan attorneys; the publication of the Michigan Bar Journal insofar as it is primarily devoted to informing members of the bar of current matters relating to regulation of the profession and the improvement of professional standards; the Client Security Fund insofar as it represents a discharge of a duty to protect the public from recreant members of the profession; activities designed to educate the general public concerning the use of legal services and the relationship between persons and the legal system generally; and activities, such as the Lawyer Referral Service and support for legal aid organizations serving the indigent, designed to make legal services more accessible. The bar should poll its members to identify those willing to support other activities voluntarily and permit solicitation of contributions. The bar further should determine the portion of dues paid by each member which does not relate to constitutionally permissible activities and reduce the amount of the dues by that amount. The plaintiff should be informed of the portion of his bar dues which are constitutionally permissible and pay that amount to the State Bar within 30 days after notification.

SEPARATE OPINION BY BOYLE, J.

1. ATTORNEY AND CLIENT — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

*The State Bar of Michigan may use the compulsory dues of its members to support lobbying and other political activities where such activities do not greatly infringe on protected First Amendment interests of the individual members and where the interest of the government in receiving the collective counsel of the bar greatly outweighs the injury to the individual interest (US Const, Ams I, XIV).*

2. CONSTITUTIONAL LAW — FIRST AMENDMENT — NEGATIVE RIGHTS.

*Strict scrutiny is not applied to determine whether the rights of non-association and non-expression which may be protected*

*under the First Amendment have been violated; rather, the severity of the injury to the interests of the individual must be balanced against the interest of the government in a requirement or regulation; the more serious the infringement, the more vital the government interest must be to outweigh it (US Const, Ams I, XIV).*

3. ATTORNEY AND CLIENT — FIRST AMENDMENT — STATE BAR — NON-POLITICAL ACTIVITIES.

*Non-political activities of the State Bar of Michigan such as certain activities of the Young Lawyers Section and the Lawyers Wives, prepaid legal services, lawyer placement services, and social functions which are supported by compulsory dues may not be fairly characterized as compelled expression violative of First Amendment rights; any ideological content would be too attenuated to burden a person's freedom of conscience (US Const, Ams I, XIV).*

4. ATTORNEY AND CLIENT — FIRST AMENDMENT — STATE BAR — POLITICAL ACTIVITIES.

*The use of compulsory dues by the State Bar of Michigan to render advice on the content of legislation or to support or oppose legislation infringes on a member's First Amendment right of free expression where the member is compelled to participate in the political expression of the bar even though opposed to the bar's position or desirous of taking no position; however, the infringement is not great because expression of personal agreement with the bar's position is not forced, and the interest of the government, on the other hand, in receiving the collective counsel of the bar with respect to legislation is great and outweighs the injury to the personal interest (US Const, Ams I, XIV).*

SEPARATE OPINION BY KAVANAGH, J.

5. ATTORNEY AND CLIENT — STATE BAR — SPECIAL PROCEEDING — CONSTITUTIONAL LAW.

*Constitutional issues should await a proceeding in which they are necessary to decision rather than being discussed in a proceeding which is not a lawsuit or even an action whose procedure is delineated by statute, court rule, or precedent, but rather is in the nature of a rule-making proceeding under the Supreme Court's statutory power to regulate the conduct and activities of the State Bar of Michigan.*

Separate Opinion by Ryan, J.

6. ATTORNEY AND CLIENT — FIRST AMENDMENT — STATE BAR —
   STATE INTEREST.

   *The State of Michigan, through the combined actions of the
   Supreme Court, the Legislature, and the State Bar, may com-
   pulsorily exact dues, and require association of attorneys, to
   support only those duties and functions of the State Bar which
   serve a compelling state interest and which cannot be accom-
   plished by means less intrusive upon the First Amendment
   rights of objecting attorneys (US Const, Ams I, XIV; Const
   1963, art 6, § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904;
   State Bar Rule 1).*

7. ATTORNEY AND CLIENT — FIRST AMENDMENT — STATE BAR —
   STATE INTEREST.

   *The regulation of the practice of law, the maintenance of high
   standards in the legal profession, and the discharge of the
   profession's duty to protect and inform the public are purposes
   in which the State of Michigan has a compelling interest
   justifying unavoidable intrusions on the First Amendment
   rights of attorneys; on the other hand, political and legislative
   activities are impermissible intrusions, as are activities de-
   signed to further commercial and economic interests of the
   members of the bar (US Const, Ams I, XIV; Const 1963, art 6,
   § 5; MCL 600.901, 600.904; MSA 27A.901, 27A.904; State Bar
   Rule 1).*

8. ATTORNEY AND CLIENT — FIRST AMENDMENT — STATE BAR —
   YOUNG LAWYERS SECTION — MAILING LISTS.

   *The questions whether the commercial sale of the mailing list of
   the State Bar of Michigan and whether automatic membership
   of certain attorneys because of age or years of admission in the
   Young Lawyers Section of the bar were an unlawful and
   unconstitutional infringement on the First Amendment rights
   of the members of the bar were moot where members could
   remove their names from the mailing list and could disassoci-
   ate themselves from the section (US Const, Ams I, XIV).*

9. ATTORNEY AND CLIENT — FIRST AMENDMENT — STATE BAR —
   YOUNG LAWYERS SECTION.

   *The activities of the Young Lawyers Section of the State Bar of
   Michigan which are legislative or political or are designed
   primarily to further the economic opportunities of young law-
   yers are constitutionally impermissible, while purely educa-
   tional activities or activities designed to make legal services
   more accessible are not (US Const, Ams I, XIV).*

10. ATTORNEY AND CLIENT — FIRST AMENDMENT — STATE BAR — LAWYERS WIVES ORGANIZATION.

*The Lawyers Wives of Michigan, as an adjunct to the State Bar of Michigan designed to educate the general public concerning the use of legal services and the relationship between persons and the legal system, is a constitutionally permissible activity of the State Bar (US Const, Ams I, XIV).*

11. ATTORNEY AND CLIENT — FIRST AMENDMENT — STATE BAR — PERMISSIBLE ACTIVITIES.

*The State Bar of Michigan, effective October 1, 1983, may not disburse compulsorily exacted dues for any functions or purposes other than: all regulatory activities; all continuing legal education activities which are directed to the maintenance of high professional standards among Michigan attorneys; the publication of the Michigan Bar Journal insofar as it is primarily devoted to informing members of the bar of current matters relating to regulation of the profession and the improvement of professional standards; the Client Security Fund insofar as it represents a discharge of a duty to protect the public from recreant members of the profession; activities designed to educate the general public concerning the use of legal services and the relationship between persons and the legal system generally; and activities, such as the Lawyer Referral Service and support for legal aid organizations serving the indigent, designed to make legal services more accessible (US Const, Ams I, XIV).*

12. ATTORNEY AND CLIENT — FIRST AMENDMENT — STATE BAR — STATE INTEREST.

*The State Bar of Michigan may not use compulsorily exacted dues to support activities which do not serve a compelling state interest, but it must poll its members before October 1, 1983, to identify those members who would be willing to support such activities voluntarily and permit solicitation of contributions (US Const, Ams I, XIV).*

13. ATTORNEY AND CLIENT — FIRST AMENDMENT — STATE BAR.

*The State Bar of Michigan must determine the portion of dues paid by each member which does not relate to constitutionally permissible activities and reduce the amount of the dues by that amount on and after October 1, 1983 (US Const, Ams I, XIV).*

*Allan Falk, in propria persona.*

*Bushnell, Gage, Doctoroff & Reizen* (by *George E. Bushnell, Jr.,* and *John K. Parker)* for the respondent.

PER CURIAM. Disposition of this matter requires us to determine whether petitioner Falk is entitled to the relief he prayed for in his "Petition for Special Relief" originally filed November 30, 1977.

A majority of the Court is not persuaded that he is so entitled and, accordingly, the relief requested in the Petition for Special Relief is denied.

This proceeding has convinced us all, however, that certain practices of the State Bar may warrant closer scrutiny pursuant to our duty to superintend its activities. We will in the near future, therefore, by separate administrative order, appoint a committee to review those practices and activities and make recommendations to the Court.

Petition dismissed.

WILLIAMS, C.J., and KAVANAGH, LEVIN, RYAN, BRICKLEY, CAVANAGH, and BOYLE, JJ., concurred.

BOYLE, J. Plaintiff Falk began this suit on November 30, 1977, by filing a "Petition for Special Relief" naming the State Bar of Michigan as defendant. Plaintiff raised First Amendment constitutional challenges to various activities of the State Bar based on the funding of those activities from his mandatory dues.[1] This Court appointed former Judge Maurice E. Schoenberger to conduct a hearing and make findings of fact. After receipt of Judge Schoenberger's report and the transcript of the hearing he conducted, and after briefing and oral argument, this Court rendered its first opinion

---

[1] Plaintiff has not contested the validity of expenditures in support of the Attorney Grievance Commission, the Character and Fitness Committee, and the Institute for Continuing Legal Education.

in this case. *Falk v State Bar of Michigan,* 411
Mich 63; 305 NW2d 201 (1981) *(Falk I).*

The members of this Court were unable to agree
in *Falk I* concerning the extent of the relief, if
any, that plaintiff should receive. The Court unani-
mously agreed, however, that further factual find-
ings should be ordered. Therefore, the Court ap-
pointed the Honorable James H. Lincoln to con-
duct additional hearings. The Court ordered fur-
ther development of the record with regard to the
following activities of the State Bar:

"[T]he Young Lawyers Section and Lawyers Wives,
the Lawyer Placement Service, the commercial sale of
the bar's mailing list, and bar activities addressed to
influencing legislation." 411 Mich 83.[2]

We now have the results of those extensive
hearings. Both sides have again briefed and argued
the relevant issues.

At the outset, I agree with the opinion of Justice
RYAN in *Falk I,* pp 84-87,[3] concerning our jurisdic-
tion to hear and dispose of this case. That is, I
agree that plaintiff's petition most closely resem-
bles, and is properly treated as a complaint for a
writ of superintending control under GCR 1963,
851(6); MCL 600.215, 600.219; MSA 27A.215,
27A.219. I note also that Justice WILLIAMS in his
opinion in *Falk I, supra,* p 122, fn 4, reached this
issue and concurred with Justice RYAN's treatment

[2] In connection with the Lawyers Wives activities, the Court advised
that no further evidence was necessary concerning the preparation
and distribution of the Juror's Manual, the distribution of the "You
and the Law" booklet, and funding of the Children's Charter. 411
Mich 83, fn 1.

[3] I do not, however, adopt the disposition of plaintiff's invasion of
privacy claim made by Justice RYAN in *Falk I,* 411 Mich 85, fn 3. Nor
do I adopt his disposition of plaintiff's First Amendment challenge to
bar expenditures for certain social functions, *id.* See discussion below.

of the petition as a complaint for a writ of superintending control. Because five members of this Court have previously reached and disposed of this issue, it is properly viewed as the law of the case. Therefore, I agree that this case is properly within this Court's original jurisdiction.

## I. THE EFFECT OF *FALK I*

As pointed out in the several opinions in *Falk I,* it is undisputed that the State Bar of Michigan is an "integrated bar". "[T]he State of Michigan, through the combined actions of this Court, the Legislature, and the State Bar, compels all licensed attorneys to associate in and provide financial support for the integrated State Bar." *Falk I, supra,* p 87 (opinion of RYAN, J.).

Plaintiff challenges the use of his mandatory dues to finance various activities of the bar. Justice WILLIAMS listed those activities in *Falk I:*

"(1) lobbying and other political activity, (2) compulsory membership in Young Lawyers Section, (3) promoting prepaid legal services, (4) lawyer referral, (5) lawyer placement, (6) Client Security Fund, (7) public education about legal services, (8) funding of Lawyers Wives of Michigan and Children's Charter of Michigan activities, (9) giving and paying for social functions, including those where the Supreme Court Justices are guests of honor, (10) appearing before the State Officers Compensation Commission in support of higher Supreme Court and other judicial salaries, and (11) sale of use of State Bar mailing roster." 411 Mich 120.

Upon analysis of the several opinions in *Falk I,* it appears that some of these challenged activities have passed constitutional muster. The Court unanimously rejected plaintiff's challenge to the use of his dues for support of the bar's lawyer

referral service.[4] The Court was also unanimous in rejecting the challenge to expenditures for public education about legal services.[5] A majority of the Court also upheld the use of bar dues to finance a Client Security Fund.[6] By application of the law-of-the-case doctrine, we are foreclosed from reconsideration of those items here.

In addition, two other challenges are now moot. At the present time, the bar provides an opportunity to its members to remove their names from the mailing list which is offered for sale to interested parties. Similarly, otherwise eligible members of the Young Lawyers Section may disassociate themselves from membership in that organization.[7] Therefore, neither of these issues presents a constitutional question requiring resolution at this time.

To summarize, plaintiff's challenges to the following activities remain undecided after *Falk I:* (1) certain activities of the Young Lawyers Section, (2) promotion of prepaid legal services, (3) lawyer placement services, (4) certain activities of the Lawyers Wives, (5) social functions, (6) appearing before the State Officers Compensation Commission, and (7) lobbying and other political activity.

---

[4] *Falk I, supra,* pp 115-116 (opinion of RYAN, J.); pp 153-156 (opinion of WILLIAMS, J.); pp 175-176 (opinion of LEVIN, J.).

[5] *Falk I, supra,* p 115 (opinion of RYAN, J.); pp 157-158 (opinion of WILLIAMS, J.); pp 175-176 (opinion of LEVIN, J.). I also find that the combined opinions of Justices WILLIAMS and LEVIN have validated bar expenditures which relate to the public education activities of the Young Lawyers Section and the Lawyers Wives, specifically the publication and distribution of the Juror's Manual, the "You and the Law" booklet, and the funding of the Children's Charter. *Falk I, supra,* pp 151-153, 157-158 (WILLIAMS, J.); p 176 (LEVIN, J.).

[6] *Falk I, supra,* p 115 (opinion of RYAN, J.); pp 153-156 (opinion of WILLIAMS, J.). The opinion of Justice LEVIN, which was joined by Justice KAVANAGH, was silent on this issue.

[7] Some funded activities of the Young Lawyers do continue to present a live controversy. See discussion below.

## II. THE CONSTITUTIONAL TEST

As indicated above, there was no agreement among a majority of the members of this Court in *Falk I* concerning the proper constitutional standard to be applied to test plaintiff's challenges to expenditures of the integrated State Bar of Michigan. Three members of the Court believed that relevant First Amendment[8] decisions of the United States Supreme Court required that bar activities be subjected to strict scrutiny:

"We therefore conclude that, in light of the controlling First Amendment principles as hereinabove discussed, the State of Michigan, through the combined actions of this Court, the Legislature, and the State Bar, may compulsorily exact dues, and require association, to support only those duties and functions of the State Bar which serve compelling state interests and which cannot be accomplished by means less intrusive upon the First Amendment rights of objecting individual attorneys." 411 Mich 112 (opinion of RYAN, J.).

Two other members of the Court believed a different constitutional test was applicable:

"We find that the First Amendment is not absolute but will give way to certain state activities which are germane to a compelling state interest. The state has a compelling interest in promoting improvements in the administration of justice and advancing the science of jurisprudence in order to fulfill its function of protecting the health, safety and welfare of its citizens. The

---

[8] We recognize that it is technically a violation of the Fourteenth Amendment that plaintiff asserts has occurred through the action of the State of Michigan. It is through the Due Process Clause of the Fourteenth Amendment that First Amendment freedoms are protected from infringement by the states. See *Virginia State Board of Pharmacy v Virginia Citizens Consumer Council, Inc*, 425 US 748, 749, fn 1; 96 S Ct 1817; 48 L Ed 2d 346 (1976). We will refer to the First Amendment for the sake of convenience. .

state may employ activities which are germane to this compelling state interest." 411 Mich 132 (opinion of WILLIAMS, J.).

The remaining two members found it unnecessary to decide what the appropriate standard of judicial scrutiny was because of the inadequately developed record.[9] See *Falk I, supra,* p 175 (opinion of LEVIN, J.).

I am unable to agree that either of the formulations of the constitutional test in *Falk I* is correct. I am brought to this conclusion by a careful analysis of the precise First Amendment interest to be protected under these circumstances and by an examination of the cases in which the United States Supreme Court has discussed such an interest.

## A. The Interest

The most familiar First Amendment claim is a challenge to state action in which a citizen complains of some interference by the government with an attempt to exercise, in an affirmative way, protected rights to speak or to associate with others. Typical First Amendment cases involve persons who wish to express themselves in a particular manner in the face of limiting or prohibitory government regulation.[10] Other typical cases involve individuals who wish to associate with others and who claim that governmental action in some manner inhibits their ability to do so.[11]

This case does not fit the typical mold. Rather,

[9] However, Justice LEVIN did find that certain activities of the bar were clearly permissible even under the strictest standard of review. *Falk I, supra,* pp 175-176. See discussion in Part I.

[10] See, *e.g., Shuttlesworth v City of Birmingham,* 394 US 147; 89 S Ct 935; 22 L Ed 2d 162 (1969).

[11] See, *e.g., Keyishian v Board of Regents of University of State of New York,* 385 US 589; 87 S Ct 675; 17 L Ed 2d 629 (1967).

what plaintiff complains of here is, in essence, government action which compels him to associate and compels him to participate in certain forms of expression.[12] The right that plaintiff asserts is a right of non-association and of non-expression.

Because the individual seeks, in effect, to remain silent, the right of non-association cannot logically be based on the policy of maintaining a "free marketplace for ideas" which is usually advanced in connection with rights of unfettered expression. However, compelled association can reasonably be seen as an infringement upon more personal individual interests such as freedom of conscience. See Gaebler, *First Amendment Protection Against Government Compelled Expression and Association,* 23 BC L Rev 995, 1004 (1982). Professor Laurence Tribe has described this interest more completely:

"The Constitution has enumerated specific categories of thought and conscience for special treatment: religion and speech. Courts have at times properly generalized from these protections, together with the guarantees of liberty in the due process clauses of the fifth and fourteenth amendments, to derive a capacious realm of individual conscience, and to define a 'sphere of intellect and spirit' constitutionally secure from the machinations and manipulations of government." Tribe, *American Constitutional Law,* § 15-5, pp 899-900.

Recognition of the nature of plaintiff's interest is the analytical *sine qua non* for resolution of the issues currently before the Court and also the appropriate vehicle for understanding and harmonizing the relevant United States Supreme Court

---

[12] Such rights have been referred to as "negative" First Amendment rights. Gaebler, *First Amendment Protection Against Government Compelled Expression and Association,* 23 BC L Rev 995, 996 (1982).

decisions. Once harmonized, these cases produce a test which can be applied to the facts of the case at bar.

## B. The Cases

The Supreme Court of the United States has recognized a constitutional right of non-association in several cases.[13] The first of these was *West Virginia State Bd of Ed v Barnette,* 319 US 624; 63 S Ct 1178; 87 L Ed 1628 (1943). In that case, the school board required all students and teachers to salute the flag and recite the pledge of allegiance in the classroom. Failure to do so constituted grounds for expulsion or dismissal. Plaintiffs, who were Jehovah's Witnesses, refused to salute the flag because of their religious beliefs. The Court invalidated the statute on First Amendment grounds.[14]

The next case decided by the Court which involved negative First Amendment rights was *Wooley v Maynard,* 430 US 705; 97 S Ct 1428; 51 L Ed 2d 752 (1977). Mr. and Mrs. Maynard, Jehovah's Witnesses, objected to the display of the New Hampshire state motto, "Live Free or Die", on the license plate of their automobile. When they cov-

---

[13] One case which is not discussed here is *Elrod v Burns,* 427 US 347; 96 S Ct 2673; 49 L Ed 2d 547 (1976). In that case, the Court struck down a job requirement which forced employees of the county sheriff to belong to the political party of the sheriff in office. The Court applied strict scrutiny to invalidate the requirement as an impermissible infringement on First Amendment rights except as applied to policy-making employees. However, the application of strict scrutiny in *Elrod* can be traced to typical affirmative (as opposed to negative) speech and association concerns. The sheriff's employees could not choose to belong to the opposing political party and keep their jobs. As further analysis will show, such a restriction on protected affirmative exercises is not present on the facts of the case at bar.

[14] A plurality of the Court came to that decision without relying on an infringement of the Free Exercise Clause of the First Amendment. 319 US 635, 642 (opinion of Jackson, J.).

ered the motto with tape, they were cited for a misdemeanor. Eventually, the Maynards sued in federal court to enjoin enforcement of the misdemeanor statute on First Amendment grounds.

The Court held that the Maynards had a protected right to remain silent and to refuse to be associated with the message behind the motto:

"We begin with the proposition that the right of freedom of thought protected by the First Amendment against state action includes both the right to speak freely and the right to refrain from speaking at all. See *West Virginia State Bd of Ed v Barnette*, 319 US 624, 633-634; 63 S Ct 1178; 87 L Ed 1628 (1943); *id.,* p 645 (Murphy, J., *concurring*). A system which secures the right to proselytize religious, political, and ideological causes must also guarantee the concomitant right to decline to foster such concepts. The right to speak and the right to refrain from speaking are complementary components of the broader concept of 'individual freedom of mind.' *Id.,* p 637." 430 US 714.[15]

The next case dealing with negative First Amendment interests was *Abood v Detroit Bd of Ed,* 431 US 209; 97 S Ct 1782; 52 L Ed 2d 261 (1977). Plaintiff Falk relies heavily on this case to support his challenge. The opinions of Justices RYAN and WILLIAMS in *Falk I* agreed that *Abood* controlled the issues raised here, but disagreed concerning the standard of review called for by that case.

*Abood* involved a challenge by public school teachers to a statutorily mandated union shop provision of their collective-bargaining agreement. Non-union teachers were required to pay service fees equal to union dues as a condition of their employment. The teachers maintained that the

---

[15] As in the *Barnette* plurality, the Court did not rely on the free exercise of religion to support its holding.

exaction of such fees to support the costs of collective bargaining and to support the political activities of the union violated their First Amendment rights.

The Court found that compelling payment of the fees for either purpose implicated First Amendment interests.[16] It upheld the exaction as it related to collective bargaining, but struck down the use of the fees for political and ideological activities unrelated to collective bargaining or contract administration.

The most recently decided case involving negative First Amendment interests is *PruneYard Shopping Center v Robins,* 447 US 74; 100 S Ct 2035; 64 L Ed 2d 741 (1980). That case involved the right of citizens to peacefully distribute political material in a privately owned shopping center. The California Supreme Court held that such a right existed under the California Constitution.

The shopping center owners appealed to the United States Supreme Court, arguing *inter alia* that their First Amendment right of non-association was violated by the California decision, which in effect compelled the use of their property for political expression.

The Court rejected the owners' claim. It distinguished *Wooley* on several grounds. The Court found that because of the character of the property involved, *i.e.,* a public shopping center, reasonable persons would not be likely to connect the political views expressed there with the owners. The Court also noted that the content of the speech permitted was not prescribed by the government and that the owners were free to disavow the views expressed.

---

[16] The Court did not reach the teachers' challenge to the use of the fees to support union social activities because of an inadequate record. 431 US 236, fn 33.

Finally, most directly on point for purposes of this case is the United States Supreme Court opinion in *Lathrop v Donohue,* 367 US 820; 81 S Ct 1826; 6 L Ed 2d 1191 (1961). In that case, plaintiff challenged the state's power to require him to belong and pay dues to the Wisconsin State Bar. The plaintiff objected to both the fact of mandatory membership and the use of his mandatory dues for political purposes.

A majority of the Court agreed that Wisconsin had a sufficiently significant interest in maintaining an integrated bar to justify compelling plaintiff's membership. There was no majority view, however, on the political expenditure question. Four members of the Court found that the issue had not been properly raised in the courts below. 367 US 846 (Brennan, J., plurality opinion). However, Justice Harlan, joined by Justice Frankfurter, found the question properly presented and found no First Amendment violation. 367 US 848 (Harlan, J., *concurring*).[17]

## C. The Test

While the decisions of the Supreme Court make it clear that under certain circumstances there is a constitutional right to be free from compelled association or expression, the Supreme Court has not clearly articulated a test to be applied to determine the extent of that right.

However, it is clear that the Supreme Court *does not* consider the strict scrutiny applied in other First Amendment cases to be appropriate in cases involving negative First Amendment rights. Even the facts of *Barnette* did not prompt the

[17] Justice Whittaker concurred in the judgment because he believed that no constitutionally protected interest was implicated. 367 US 865. Justices Black and Douglas dissented. 367 US 865, 877.

Court to engage in the traditional test which involves a compelling state interest and the least restrictive regulatory alternative. Because such analysis is conspicuous by its absence from negative First Amendment cases, we are unable to conclude that the Supreme Court would apply it to resolve the case at bar.

However, when examined carefully, the cases discussed above reveal a consistent pattern of analysis. This close examination indicates that in resolving the various claims the Court has balanced the severity of the injury to the individual interest against the magnitude of the government interest sought to be served by the requirement or regulation. In this manner, the Court has decided whether the complained-of government action constitutes an impermissible First Amendment infringement.[18]

"Whenever a government requirement is challenged on the basis that it compels expression the initial inquiry must be whether the requirement does in fact infringe upon negative First Amendment interests and if so how seriously. The judicial task does not end here, however. It is also necessary to consider what government interests may be served by the requirement in question, and under what circumstances advancement of a government interest might outweigh the concomitant infringement of individual negative First Amendment interests." Gaebler, *supra,* p 1014.

The first step in this analysis is a determination whether the asserted claim implicates the First Amendment at all. It is only when the conduct regulated can fairly be characterized as expression that the First Amendment can be cited as a source of protection. Once a determination is made that

[18] See the invaluable analysis contained in Gaebler, *supra,* pp 1006-1014.

the government requirement infringes on a First Amendment interest, the key factor in determining the severity of the infringement is the intimacy of the connection between the individual and the compelled expression. If there is only a very attenuated link between the individual and the compelled expression, the government interest advanced to justify the requirement need not be substantial. This seems to be the import of Justice Harlan's concurring opinion in *Lathrop, supra,* p 858.

Conversely, the more directly the compelled expression relates to the individual, the more important must be the government interest advanced to justify it. For example, in *Barnette,* the government required the individual to salute the flag and verbally pledge national allegiance. A requirement which entails such intimate personal action has a direct impact on the individual's freedom of conscience and constitutes a severe invasion of the protected sphere of intellect and spirit. The individual is required to personally and directly proclaim a belief which is repugnant to him.

The Court in *Barnette* made it clear that some interest much more urgent and immediate than a general interest in national unity would have to be advanced to justify such a First Amendment infringement. 319 US 633. In fact, the Court expressed doubt about whether such an interest might ever exist. 319 US 642.

In *Wooley,* the government intrusion was less personal and direct than in *Barnette.* Being forced to display a personally offensive motto on the license plate of a vehicle requires less intimate expression than does a compulsory pledge of allegiance. Accordingly, the Court in *Wooley* devoted significantly more discussion to the asserted gov-

ernment interests behind the compelled expression. Nevertheless, it found the state interests to be insufficient in relation to the infringement.

In *Abood,* the Court held that First Amendment interests were implicated in compelling non-union teachers to pay service fees equal to union dues. However, the Court found that the government interest in preserving labor peace and the elimination of "free riders"[19] outweighed the infringement. In reaching this conclusion, the Court did not carefully examine the government interest. Arguably, this can be explained as an implicit finding that the infringement of individual interests was not severe. See Gaebler, *supra,* p 1015. Certainly, the same degree of compelled personal expression involved in *Barnette* and *Wooley* was not present in *Abood.* Non-union teachers were asked to support the right of the union to exist only through the relatively indirect method of financial support. The direct relation of the compelled support to the government interest in peaceful collective bargaining justified the infringement.

However, use of government-mandated fees for political or ideological purposes unrelated to collective bargaining was held to be an invalid infringement of a protected interest. The plurality did not specifically explain why this result was necessary. Nevertheless, because the plurality emphasized the absence of a link to collective bargaining, the result seems to turn on the insufficiency of the government interest in this aspect of the compelled contribution.

Justice Harlan engaged in similar analysis in his concurring opinion in *Lathrop, supra,* p 848,

---

[19] The term "free riders" refers to those who reap the benefits of collective bargaining without bearing a proportionate share of the cost. *Abood, supra,* pp 221-222.

although he arrived at a different result. He found that Wisconsin had a "most substantial state interest" in hearing "the views of the members of its Bar 'on measures directly affecting the administration of justice and the practice of law'". 367 US 864. He acknowledged that the compelled-expression rationale in *Barnette* was relevant, but distinguished that case as involving a more concrete and intimate expression of belief:

"What seems to me obvious is the large difference in degree between, on the one hand, being compelled to raise one's hand and recite a belief as one's own, and, on the other, being compelled to contribute dues to a bar association fund which is to be used in part to promote the expression of views in the name of the organization (not in the name of the dues payor), which views when adopted may turn out to be contrary to the views of the dues payor. I think this is a situation where the difference in degree is so great as to amount to a difference in substance." 367 US 858.

Balancing is also implicit in the *PruneYard* case. As discussed above, the Court indicated that the negative First Amendment rights of the shopping center owners were not seriously infringed by the indirect form of compelled expression in that case. Because such a minor injury was involved, the Court paid little attention to the magnitude of the government interest.[20]

In summary, when these cases are considered together, a balancing test for asserted violations of negative First Amendment rights emerges.

[20] Arguably, the Court believed that there was no First Amendment injury at all:

"Eventually a point is reached where the level of personal involvement is so minimal and the resulting nexus between the individual and the message so remote that no legally cognizable infringement of negative first amendment interests occurs." Gaebler, *supra*, p 1014.

"In other words, negative First Amendment cases require a sliding scale approach to balancing. The more serious the infringement of individual interests, the more vital the asserted advancement of government interests must be to outweigh the infringement and vice versa. The question in each case must be whether the compelled participation in expression infringes unduly upon individual interests." Gaebler, *supra,* p 1016.

It is this test which should be applied to decide the merits of Falk's objections to the expenditures of his compelled bar dues.

### III. The Constitutional Test Applied

As mentioned in Part I, this Court has not decided the merits of plaintiff's constitutional objections to the following activities of the State Bar: (1) certain activities of the Young Lawyers Section, (2) promotion of prepaid legal services, (3) lawyer placement services, (4) certain activities of the Lawyers Wives, (5) social functions, (6) appearing before the State Officers Compensation Commission, and (7) lobbying and other political activity.

In applying the constitutional test which has been articulated above, it is necessary to further examine the precise nature of plaintiff's objections to these activities.

In connection with the volunteer legal assistance rendered by the Young Lawyers Section, plaintiff argues that such activity is more properly conducted by government and funded by tax revenues. Plaintiff makes a similar argument concerning the lawyer placement services of the bar.

Plaintiff objects to the bar's promotion of prepaid legal services because, as an employee of the public sector, he receives no benefit from such promotion. Similarly, plaintiff objects to the bar's

support of the Lawyers Wives because he is unmarried and receives no benefit from the activity.

In addition, plaintiff objects to the social functions conducted by the bar and its sections and groups because the food and drink served at these gatherings violates his religious beliefs and those of other members of the bar.

Finally, plaintiff objects to the "political" activities of the bar. More specifically, he objects to the participation of the bar in legislative drafting and in more typical lobbying efforts. Additionally, plaintiff challenges the appearance of representatives of the bar at meetings of the State Officers Compensation Commission. Bar representatives appear before the commission to argue on behalf of increased judicial compensation.

We will apply the constitutional test separately to the political and non-political challenges raised by plaintiff.

## A. Non-Political Activities

As discussed above, our first task in deciding the negative First Amendment claims raised by plaintiff is to determine if the government requirement infringes upon any negative First Amendment interests. If no infringement has occurred, the inquiry goes no further.

In connection with plaintiff's challenges to non-political activities of the bar, we find that plaintiff has not met his burden of proof in showing an injury to a protected First Amendment interest.[21] Plaintiff has not pointed out to this Court any

[21] We construe plaintiff's complaint and briefs in a light most favorable to him when we view his challenges as based upon asserted First Amendment violations. Plaintiff's arguments based on art 4, § 24 of the Michigan Constitution of 1963 (title-object clause), the Commerce Clause, US Const, art I, § 8, and other constitutional provisions are devoid of merit. See discussion in *Falk I, supra,* pp 141-142 (opinion of WILLIAMS, J.).

aspect of those activities which can fairly be characterized as compelled expression. Indeed, we doubt whether these activities contain any message at all.

In objecting to most of these activities, plaintiff has not argued that his governmentally required dues are being spent in a manner which compels his support of some belief, ideology, or position which is repugnant to him or on which he would prefer to remain silent. Rather, for the most part, plaintiff has argued that his governmentally required dues are spent in a manner which returns no economic benefit to him. If such an argument has a constitutional base, it is not in the First Amendment.

Even if the activities could be characterized as encompassing some ideological content, any asserted connection with plaintiff would be too attenuated to constitute a burden on the freedom of conscience that underlies negative First Amendment protection.

For example, plaintiff's objections to the food and drink served at social functions of the bar could conceivably be framed as an objection to a compelled expression of support for a religious message. However, if such compelled expression is present, it does not have the intimate connection with plaintiff that is necessary for it to reasonably be seen as an invasion of plaintiff's freedom of conscience. Plaintiff is not being forced to consume the food, nor is he being forced to attend the functions at which it is served. Compare *Barnette* and *Wooley, supra.* No reasonable person could attribute a religious message to plaintiff by virtue of the fact that a small portion of his mandatory bar dues is used to purchase pork or shellfish for consumption at cocktail parties sponsored by the

bar. The connection between plaintiff and any conceivable message is simply too attenuated to be protected by the First Amendment. See *Lathrop, supra* (Harlan, J., *concurring),* and *PruneYard, supra,* pp 87-88.

Alternatively, we find that the non-political activities challenged by plaintiff are fairly within the normal functions of an integrated bar. The concept of an integrated bar was constitutionally validated in *Lathrop.* Thus, the activities discussed here share in that validation. *Cf. Abood, supra,* pp 222-223 (activities which promote the cause which justified bringing the group together are permissible).

We hold therefore that plaintiff has failed to identify a protected First Amendment interest in connection with the use of his mandatory dues to support the non-political activities of the Young Lawyers Section and the Lawyers Wives. In addition, we hold that plaintiff has not shown that bar expenditures used to promote prepaid legal services, to provide lawyer placement services, or to conduct social functions violate his First Amendment rights.

## B. Political Activities

Plaintiff's challenge to the use of his mandatory dues in connection with the political activities of the bar requires a more complete application of the constitutional test. Plaintiff objects to several aspects of the political activity of the bar. He objects to the technical expertise which the bar provides to the state Legislature by assisting in drafting legislation and giving advice to the Legislature on the substantive content of the law. Plaintiff also objects to the bar's lobbying activity as conducted in the Legislature and in appearances before the State Officers Compensation Commis-

sion. Specifically, plaintiff claims that when the bar takes a position in support of or opposition to a piece of legislation, it infringes on his negative First Amendment interest to remain silent on that issue.

The first step in the constitutional test is to determine if the government action infringes upon a protected First Amendment interest. Plaintiff has carried his threshold burden of proof in connection with the bar's political activities. The bar's legislative and political involvement clearly involves a message. By rendering advice on content or supporting or opposing legislation, the bar engages in expression. To the extent that plaintiff's mandatory dues are used to support such activity, plaintiff is compelled to participate in such expression. Even if plaintiff is opposed to the bar's position, or would choose to take no position at all, he is forced to contribute to the advancement of the bar's position. His freedom of conscience and intellect have been invaded.

Plaintiff has thus suffered some cognizable First Amendment related injury. It remains to be seen, however, whether plaintiff is protected from that injury in connection with this government activity.

The next step in determining the answer to this ultimate question is to further analyze the nature of plaintiff's injury to determine its severity. As described above, the key factor in this analysis is the intimacy of the connection between plaintiff and the compelled expression.

This is not a case where plaintiff is being forced to personally express his own agreement with the political positions of the bar. Compare *Barnette, supra.* Plaintiff is also not being forced to display the bar-approved message in his home or on his automobile. Compare *Wooley, supra.* Plaintiff is

free to take a public position which is directly
opposed to that taken by the bar. See *PruneYard,
supra.* Plaintiff is required only

"to contribute dues to a bar association fund which is to
be used in part to promote the expression of views in
the name of the organization (not in the name of the
dues payor), which views when adopted may turn out to
be contrary to the views of the dues payor". *Lathrop,
supra,* p 858 (Harlan, J., *concurring).*

Thus, although the government action com-
plained of here has in fact infringed upon plain-
tiff's First Amendment interests, the severity of
the injury is not great. Plaintiff is required to
support the legislative positions taken by the bar
only through indirect financial contributions. Rea-
sonable persons are not likely to associate the
bar's expressed position with plaintiff merely be-
cause he is forced to pay dues to the bar in order
to practice law. Thus, the invasion of plaintiff's
freedom of conscience and sphere of intellect occa-
sioned by the bar's political activity is, in reality,
not great.

Our next task is to weigh the government's
interest in the bar's political activity to determine
whether it outweighs this First Amendment in-
jury. There can be little doubt that the govern-
ment has an interest in receiving the input of the
State Bar into the legislative process. The State
Bar is, of course, made up of lawyers whose busi-
ness necessarily entails knowing, understanding,
utilizing, and interpreting the law.

In this sense, the State Bar is quite different
from the labor union involved in *Abood.* It is true
that the government might have a keen interest in
the legislative participation of a labor union in
specialized areas of the law touching directly on

the field of employment of the union members or on the area of collective bargaining. But lawyers are involved with the law in almost all its forms. Therefore, their input is of broader interest to the Legislature.

In addition, the bar brings its collective experience in working with the law to the lobbying efforts and technical advice which it offers the Legislature. Certainly, the Legislature is greatly aided by the collective wisdom of the practitioners who make up the Taxation Section of the bar when it revises state taxation provisions. Similarly, the input of the Criminal Law Section is invaluable to the Legislature in its task of revising Michigan's Criminal Code.

In addition, the government has an interest in hearing the collective majority opinion of the bar on the matter of judicial compensation. Members of the bar are best able to inform the State Officers Compensation Commission what level of compensation is required in order to attract and keep qualified lawyers on the bench.

State Bar Rule 1 provides:

"The state bar of Michigan shall, under these rules, aid in promoting improvements in the administration of justice and advancements in jurisprudence, in improving relations between the legal profession and the public, and in promoting the interests of the legal profession in this State." 340 Mich xxxviii.

The political lobbying and input currently conducted by the State Bar of Michigan clearly serves those purposes.

As the foregoing discussion indicates, the government has a substantial interest in the political activity of the bar. Although this activity infringes upon plaintiff's negative First Amendment inter-

ests, we believe the government interest in the activity outweighs plaintiff's injury. We therefore hold that the State Bar of Michigan may constitutionally use the mandatory dues of its members to support the lobbying and other legislative activities of the State Bar as they are currently conducted.

## IV. CONCLUSION

Plaintiff has failed to establish his right to relief in connection with any of the undecided constitutional challenges raised by his complaint and briefs. Therefore, plaintiff's request for relief is denied.

No costs, a public question being involved.

WILLIAMS, C.J., concurred with BOYLE, J.

KAVANAGH, J. Justice LEVIN expressed our view in *Falk v State Bar,* 411 Mich 63, 166-167, fn 1; 305 NW2d 201 (1981):

"Falk commenced this action as an original proceeding in this Court denominating it 'Petition for Special Relief'. No statute or court rule expressly authorizes such a petition. If the petition were an ordinary lawsuit claiming violations of Falk's constitutional rights, it should have been filed in a circuit court. If regarded as an action for a writ of mandamus against a state officer, it should have been commenced in the Court of Appeals, or the circuit court for Ingham County or other county in which venue was proper. MCL 600.4401; MSA 27A.4401. This Court has elected to treat Falk's petition as a request to exercise the Court's statutory power to regulate the conduct and activities of the bar. MCL 600.904; MSA 27A.904.

"As such, this proceeding is more in the nature of a rule-making proceeding than a lawsuit; what character it has as a lawsuit is the result of this Court's action in

appointing a judge to conduct a hearing and make findings of fact.

"Since this is not a lawsuit, or even an action whose procedure is delineated by statute, court rule or precedent, it is inappropriate to limit our consideration of the issues presented in this proceeding according to the rules circumscribing lawsuits. To determine the scope or content of an order regulating the bar according to burdens of proof or inadequate showings in the record we ordered would be to treat this proceeding as the lawsuit it clearly is not."

While we are edified by the scholarly opinions of our colleagues, we are still persuaded that we should await a proceeding wherein it is necessary for decision to reach the constitutional issues. Accordingly, we express no opinion thereon, but wholeheartedly join in the Court's disposition of this proceeding.

LEVIN, J., concurred with KAVANAGH, J.

RYAN, J. In our previous consideration of this case,[1] we examined the extent to which an individual attorney may be required, over his First Amendment[2] objections, to pay dues to and associate himself with the integrated State Bar of Michigan. Three opinions resulted, but there was no majority for final disposition of the case.

Two members of the Court, Justice WILLIAMS and Chief Justice COLEMAN, were of the opinion that the plaintiff was entitled to no relief and would have denied his petition. Justices LEVIN and KAVANAGH were of the opinion that, while some of

[1] *Falk v State Bar of Michigan,* 411 Mich 63; 305 NW2d 201 (1981).

[2] "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances." US Const, Am I.

the issues before the Court might have been re-
solved on the record as presented, others required
further factual development. In an opinion signed
by Justice FITZGERALD and the late Justice MOODY,
I expressed the view that, while the plaintiff was
entitled to partial relief and that such relief
should have been ordered, several issues could not
be decided without further factual development.
While Justice LEVIN and I differed as to specific
bar association activities which needed further
record explication, a majority of the justices
agreed that the matter should be remanded to the
Honorable James H. Lincoln for an evidentiary
hearing to develop a more complete record with
regard to the following activities of the bar associ-
ation:

"(1) the Young Lawyers Section and Lawyers Wives,

"(2) the Lawyer Placement Service,

"(3) the commercial sale of the bar's mailing list, and

"(4) bar activities addressed to influencing legisla-
tion." 411 Mich 63, 83; 305 NW2d 201 (1981). (Numera-
tion added.)

Extensive hearings were held for 12 days be-
tween August 24, 1981, and December 18, 1981.
Eighty-three witnesses testified and numerous ex-
hibits were introduced. Since we have the benefit
of a supplemental record, we may now dispose of
the originally stated issue.

Upon careful examination of the record as aug-
mented, and after reconsideration of our prior
opinions as well as the briefs and arguments of the
parties, we adhere to my previous opinion and the
holding therein that:

"The State of Michigan, through the combined ac-
tions of the Supreme Court, the Legislature, and the

State Bar, may compulsorily exact dues, and require, association, to support only those duties and functions of the State Bar which serve a compelling state interest and which cannot be accomplished by means less intrusive upon the First Amendment rights of the objecting individuals affected." *Id.*, p 84.

Before addressing the particular activities for which a remand was made, a brief summary of the facts and my previously expressed views is in order.

Plaintiff Allan Falk filed a pleading in this Court on November 30, 1977, entitled "Petition for Special Relief", naming the State Bar of Michigan as defendant, thereby initiating an original proceeding in this Court. He claimed that many of the expenditures of the State Bar of Michigan, to which he must belong and pay dues, violated his First Amendment rights. I found it uncontroverted that the State Bar financed, in varying measure, certain bar activities to which the plaintiff objected, including legislative lobbying, the Prepaid Legal Services program, the Lawyer Referral Service programs, the Lawyer Placement Service, and the Client Security Fund.

After analyzing several decisions of the United States Supreme Court, I concluded that the result in *Abood v Detroit Bd of Ed,* 431 US 209; 97 S Ct 1782; 52 L Ed 2d 261 (1977), provided the constitutional framework for the views I expressed. *Abood* was read as holding:

"(1) that, as in *Hanson [Railway Employees' Dep't v Hanson,* 351 US 225; 76 S Ct 714; 100 L Ed 1112 (1956)]*, the State of Michigan's authorization of agency shop agreements in the public sector served a sufficiently

compelling state interest in the achievement of labor stability to permit impingement on public employees' First Amendment rights to the extent of requiring payment of service fees for purposes germane to the collective bargaining duties of the teachers' union; and (2) that to the extent that agency fees were exacted and used for purposes beyond or apart from those activities related to collective bargaining, the plaintiffs had stated a claim upon which relief could be granted under the First Amendment." 411 Mich 105. (Footnote omitted.)

Unfortunately, *Abood* failed to clearly indicate its analytical basis, depending more on its similarity to earlier decisions than on a particular test. Consequently, I relied upon *Elrod v Burns,* 427 US 347; 96 S Ct 2673; 49 L Ed 2d 547 (1976), which clearly employed the traditional "less intrusive means" balancing approach, applying it to the First Amendment area of freedom of association and freedom of belief, both of which were also implicated in *Abood.* 411 Mich 111. Under this test, First Amendment values may be impinged upon only when the infringement serves a compelling state interest which cannot be accomplished by less intrusive means.

After an explication of the relevant principles of law and consideration of the record presented, the opinion concluded with specific findings of fact and conclusions of law. Of signal importance was the finding that "the regulation of the practice of law, the maintenance of high standards in the legal profession, and the discharge of the profession's duty to protect and inform the public are * * * purposes in which the State of Michigan has a compelling interest" justifying "unavoidable intrusions on the First Amendment rights of objecting attorneys". 411 Mich 114.

I also concluded that the State of Michigan had shown a compelling state interest in certain func-

tions of the bar which could not be advanced by less intrusive means. These consisted of all regulatory activities, all continuing legal education activities, the publication of the Michigan Bar Journal *to the extent* it is devoted to informing members on current matters related to regulation of the profession and the improvement of professional standards, the Client Security Fund, activities designed to educate the public concerning the use of legal services and the relationship between individuals and the legal system generally, and activities designed to make legal services more accessible such as the Lawyer Referral Service and legal aid organizations.

On the other hand, the political and legislative activities of the bar were held to be impermissible intrusions upon First Amendment rights. Legislative or policy choices are the result of ideological beliefs, and such beliefs, and association to promote or oppose such beliefs, are essential values protected by the First Amendment. Given the alternatively "less intrusive" methods available to the Legislature to obtain expert legal advice, such functions were held not to serve a state interest identified as compelling.[3]

Similarly, activities designed to further the commercial and economic interests of the members of the bar were found to be improper, since they do not serve compelling state interests such as those identified. Thus, activities such as lawyer placement were held to violate the plaintiff's First Amendment rights.

Nothing which has been presented in the supple-

---

[3] For example, just as it is inappropriate for the State Bar to adopt and publish an official position on proposed legislation, it is also improper for it to devise legislation and arrange to have it proposed. Our prior disapproval of a professional lobbyist would imply this result as well.

mental record, or advanced in the briefs and oral arguments, or discovered upon reconsideration of my colleagues' written opinions has persuaded me to alter my original views, and they are, therefore, reaffirmed.

We find it unnecessary and unproductive to examine in this opinion every activity of the State Bar, including those of the bar's numerous committees, to determine whether they serve a compelling state interest in an unavoidably intrusive manner. Rather, we rely upon my earlier comments on the inappropriateness of political and legislative activities and those designed to promote commercial and economic interests, as opposed to those serving an educative or regulatory function as previously identified, to provide sufficient standards to determine whether specific bar activities pass or fail the petitioner's First Amendment challenge.

Attention is particularly invited to findings and conclusions Nos. 10 and 11 of my prior opinion, 411 Mich 116-118, wherein two of the bar activities which my colleagues thought required further evidence and record explication, the political and legislative activities of the bar and the Lawyer Placement Service, were discussed and found to be constitutionally unsustainable.

However, we will specifically examine those activities enumerated in the Court's remand order which have not already been addressed.[4] Given the supplemental record, we conclude that:

---

[4] It is also unnecessary for us to address all of plaintiff's arguments. Some have already been discussed and others have been answered implicitly.

For example, plaintiff objects to unpaid solicitations in the Michigan Bar Journal for LAWPAC (Lawyers Political Action Committee), the political arm of the State Bar of Michigan. He sees it as a "backdoor method of using compulsory dues" to finance LAWPAC. We agree that such a use of the Bar Journal is improper. This conclusion logically follows from our disapproval of political and

### The Bar's Mailing List

1. The parties have agreed and we find that the issue concerning the commercial sale of the bar's mailing list is moot. The State Bar offers members the opportunity to remove their names from the mailing list being used for commercial purposes. No right of privacy or First Amendment issue need be decided.

### The Young Lawyers Section

2. Although membership in the Young Lawyers Section is still "automatic" by virtue of age or years since admission, the State Bar clearly gives notice to all members upon admission, and periodically in the Bar Journal and in Inter Alia, the Young Lawyers Section publication, that they may disassociate themselves. We agree that the issue of *compelled* membership in the Young Lawyers Section is, therefore, likewise moot and need not be examined further.

Because the bar provides a measure of financial support to the Young Lawyers Section, however, its activities must be examined under the same principles as any bar activity. Here we specifically adopt Judge Lincoln's finding. Those activities that are legislative or political, or designed primarily to further the economic opportunities of "young" lawyers, are impermissible. In particular, those activities of the State Bar Juvenile Law Committee which include, among other things, rendering advice to the House of Representatives and proposing enactment of a revised juvenile code are politi-

legislative activities by the bar, 411 Mich 116, as well as our approval of the Bar Journal as a bar activity when *limited* to matters on regulation of the profession and the improvement of professional standards. *Id.,* p 115.

cal or legislative in nature.[5] On the other hand, purely educative activities by the Child Advocacy Committee are "directed to the maintenance of high professional standards among Michigan attorneys" and, as such, are not prohibited. 411 Mich 115.

The funding of Prison Legal Services of Michigan, Inc., which provides free legal counsel to Michigan prisoners in civil matters, as well as the Committee for Provision of Legal Services to the Elderly, are activities designed to make legal services more accessible. As indicated originally, "[t]hese activities represent a part of the service every attorney owes the public and hence compelling support for them cannot be deemed constitutionally obnoxious". *Id.,* p 116.

One final activity of the Young Lawyers Section that cannot be continued as presently conducted is the Prepaid Legal Services Committee. To some extent, promotion and development of such plans make legal services more accessible and promote the discharge of the profession's duty to protect and inform the public. Yet, the plans differ in a constitutionally significant way from the Lawyer Referral Service or the service of the legal aid organizations. Prepaid legal service plans benefit a narrow category of individuals; only those who can afford such a plan and who have contracted for it may use its services. The Lawyer Referral Service, however, benefits any member of the public who

---

[5] In addition to the testimonial record and exhibits produced at the hearing upon remand, we have considered the summary of the testimony by plaintiff Falk which was submitted in his brief on reargument as his Statement of Facts. Plaintiff's brief was filed long before defendant's, yet defendant failed to file a counter-statement of the facts or to contest the summary. See GCR 1963, 814.2, 854. Thus, defendant is taken to have accepted plaintiff's summary. Our acceptance of plaintiff's statement, however, does not imply acceptance of any opinions or conclusions which might have been incorporated in the summary.

requests the name of a lawyer. Any citizen who is in need of legal advice can contact the referral service, but he can avail himself of the prepaid plan only if he has a contract for such services.

Prepaid legal service plans differ from legal aid not in the number of potential beneficiaries, but in the cost of services. Legal aid is charitable in character; legal service plans are designed as profit-making enterprises. The distinguished chairman of the Prepaid Legal Services Committee testified that he became involved in the bar program to promote and develop prepaid legal service plans out of fear of losing clients to automobile manufacturers and labor union prepaid service plans—out of fear of losing income. Such plans are primarily designed to further the altogether legitimate economic interests of lawyers, despite the incidental benefit of making legal services more accessible to the middle class. Since prepaid legal service plans are designed *primarily* to further lawyers' economic interests rather than make legal services more accessible to the public in general, or those without money, they serve no compelling state interest.

### Lawyers Wives of Michigan

3. The State Bar asserts that the Lawyers Wives of Michigan, as an adjunct to the State Bar, is designed to "educate the general public concerning the use of legal services and the relationship between individuals and the legal system generally". 411 Mich 115. The supplemental record indicates that the activities of the Lawyers Wives organization include art exhibits, essay contests, brochures, publications such as "You and the Law", and Law Day activities designed to promote public education. The mere fact that Law Day may be a

substitute for International Labor Day ("Red May Day") and thus may have political overtones is unsubstantiated and, in any event, irrelevant. Law Day activities are designed to educate the public about our legal system, not incite rebellion. Consequently, under the standard quoted above, the Lawyers Wives organization is a constitutionally permissible activity.

4. All the activities for the consideration of which remand was ordered have been examined by this Court either in my previous opinion or in this one.

Consequently, we would grant the relief as announced in my original opinion, but modified to take account of the final character of the disposition of the case. We would order:

a. That the State Bar be enjoined from disbursing compulsorily exacted dues for any functions or purposes other than those described in findings and conclusions No. 9A to 9F of my prior opinion, 411 Mich 114-116, and conclusions Nos. 2 and 3 above, and that the bar poll its members to identify those willing to support such other activities on a voluntary basis and permit solicitation of contributions from those members for such purposes.

b. That the State Bar of Michigan determine the proportion of dues paid by each member which does not relate to the above-declared and aforementioned constitutional purposes and functions, and that the amount of dues as of and after October 1, 1983, the beginning of the fiscal year of the State Bar of Michigan, be reduced accordingly.

c. That plaintiff Allan Falk be advised of the portion of his excused bar dues which relates to the purposes of the State Bar described in findings and conclusions No. 9A to 9F of our first opinion,

411 Mich 114-116, and conclusions Nos. 2 and 3 above, and that he pay to the State Bar that amount within 30 days after he is so notified.

BRICKLEY and CAVANAGH, JJ., concurred with RYAN, J.